El Juez Asociado Señor Rivera García
emitió la opinión del Tribunal.
El presente recurso de certiorari nos brinda la oportuni-dad de examinar los contornos jurisdiccionales de un árbi-tro obrero-patronal al momento de conceder remedios en una disputa sujeta a la mediación laboral. Específica-mente, debemos resolver si, al disponer el convenio colec-tivo que el laudo arbitral debe ser conforme a derecho, y al permanecer silente con relación a las facultades remedia-doras conferidas a un árbitro, este último se excede en sus poderes al reponer en su antiguo puesto a un obrero des-pedido injustificadamente y otorgarle el cobro de los ingre-sos dejados de percibir para el periodo durante el cual es-tuvo destituido.
Por entender que en el caso que nos ocupa la árbitra estaba limitada a conceder el remedio exclusivo de la me-sada, dispuesto por la Ley Núm. 80 de 30 de mayo de 1976 (29 L.P.R.A. sec. 185 et seq.), confirmamos la decisión que emitió el Tribunal de Apelaciones.(1) Así, resolvemos en esta ocasión que en todo convenio colectivo que exija que el laudo sea conforme a derecho y no se exprese sobre las facultades remediadoras del árbitro, procede entonces con-ceder, ante un despido injustificado, la indemnización mí-nima que dispone la Ley Núm. 80, supra, sin más; entién-dase, la mesada.
H
El Sr. Anselmo Lugo Reyes laboraba desde el 29 de sep-tiembre de 1997 como organizador sindical de Servidores *307 Públicos Unidos de Puerto Rico (SPU), una organización obrera afiliada a AFSCME-AFL-CIO y dedicada a la sindi-cación de empleados públicos en Puerto Rico, según la Ley Núm. 45 de 25 de febrero de 1998, conocida como la Ley de Relaciones del Trabajo para el Servicio Público de Puerto Rico, 3 L.P.R.A. secs. 1451-1454a. El 25 de marzo de 2002, SPU despidió al señor Lugo Reyes por alegadas violaciones al Reglamento de Personal de la organización. Concreta-mente, se le imputó haberse expresado verbalmente y por escrito con un lenguaje despectivo y discriminatorio contra los líderes y presidentes de uniones laborales asociadas con SPU, en particular, contra el Director Ejecutivo y el Director de Organización de la recurrida.(2) Además, SPU fun-damentó su decisión de destitución del señor Lugo Reyes en el alegado desempeño deficiente de sus deberes y funciones.
Al momento de los hechos, los organizadores sindicales de SPU, entre ellos el señor Lugo Reyes, estaban constitui-dos colectivamente bajo la Confederación de Organizado- *308 res de Puerto Rico (COPR), que desde 1999 era el sindicato y la representante exclusiva de la unidad apropiada com-puesta por estos. Las relaciones obrero-patronales entre COPR y SPU se regían por un convenio colectivo vigente desde el 12 de marzo de 2002 hasta el 31 de diciembre de 2003.(3)
En el Art. X(F) y (H), sobre Quejas y Agravios del refe-rido convenio colectivo, las partes habían acordado que “en aquellos casos en que un empleado considerara] injust[o su despido], deber[ía] presentar su querella por escrito, acudiendo directamente al Tercer Paso de[l procedimiento para la tramitación de querellas]”.(4) Este último paso dis-ponía que “el asunto [fuera] sometido al Negociado de Con-ciliación y Arbitraje” (Negociado) para que un árbitro emi-tiera un laudo “por escrito y conforme a derecho” que pusiera fin a la disputa. (5)
Amparándose en el procedimiento dispuesto en el refe-rido convenio, la COPR, en representación del señor Lugo Reyes, presentó una solicitud de arbitraje ante el Nego-ciado en la cual alegó que su despido violó el convenio co-lectivo vigente al momento de los hechos. Al disponer un acuerdo de sumisión, las partes no lograron un consenso respecto al asunto que debían resolver.(6) Por lo cual la árbitra, Elizabeth Guzmán Rodríguez, fundándose en el *309 Reglamento para el Orden Interno de los Servicios de Arbitraje del Negociado(7) dispuso que la controversia a resolver era “si el despido del Sr. Anselmo Lugo Reyes, es-tuvo o no justificado. De no estarlo, que el Arbitro apli[cara] el remedio adecuado”(8)
Concretado así el acuerdo de sumisión, la vista de arbi-traje se celebró el 1 de julio y el 13 de agosto de 2003. Luego que ambas partes presentaran prueba testifical y documental en la vista celebrada el 13 de mayo de 2004, la árbitra emitió su laudo. Este dictamen modificó la sanción de despido que impuso SPU a una suspensión de empleo y sueldo por treinta días laborables, y ordenó la reposición del señor Lugo Reyes a su antiguo puesto con el pago de todos los haberes dejados de percibir por el periodo de tiempo durante el cual estuvo destituido.
Así las cosas, el 10 de junio de 2004, SPU acudió al Tribunal de Primera Instancia para solicitar la revisión del laudo. En esencia, alegó que la árbitra erró al resolver que tenía autoridad para ordenar la reinstalación del señor *310 Lugo Reyes y el pago de todos los salarios y beneficios que este dejó de devengar, e impugnó la determinación de que el despido fue injustificado.
El 5 de abril de 2005, el foro primario dictó su sentencia en la cual sostuvo la determinación de la árbitra sobre el despido injustificado del señor Lugo Reyes. Sin embargo, revocó la orden de reinstalación en su antiguo puesto, al igual que el cobro de salarios dejados de percibir. Funda-mentó su decisión en el entendimiento de que en un laudo emitido conforme a derecho solo aplicaba el remedio exclu-sivo de la mesada provisto por la Ley Núm. 80, supra.
El 17 de agosto de 2005, mediante un recurso de certio-rari, la parte peticionaria impugnó la decisión del juzgador de instancia ante el Tribunal de Apelaciones. El 23 de diciembre de 2005, el foro apelativo intermedio confirmó al tribunal sentenciador. Mediante un recurso de certiorari, la controversia ahora se encuentra ante nuestra consideración.
En su recurso de certiorari, el señor Lugo Reyes arguye que el Tribunal de Apelaciones
... cometió error craso y manifiesto en Derecho, al dictar Sen-tencia final. Ello se debe a que no procedía reafirmar la modi-ficación del Laudo arbitral, sino ponerlo en pleno vigor, ante el hecho de que en el presente caso, si el Convenio Colectivo sí requería justa esta [sic] causa para el despido del co-peticio-nario Lugo, la [Á]rbitr[a] Guzmán Rodríguez tenía indudable discreción adjudicativa para ordenar los referidos remedios apropiados de reposición y pago retroactivo de salarios y de-más haberes dejados de devengar .... Recurso de certiorari, págs. 8-9.
De acuerdo con este trasfondo fáctico, procedemos a exa-minar el derecho aplicable a la controversia reseñada.
*311 II
A. La Ley de Relaciones del Trabajo de Puerto Rico de 1945
La aprobación de la Ley de Relaciones del Trabajo de Puerto Rico, Ley Núm. 130 de 8 de mayo de 1945 (Ley Núm. 130), según enmendada, 29 L.P.R.A. sec. 61 et seq., marca el inicio del desarrollo de la legislación obrero-patronal en Puerto Rico. Véase D. Fernández y C. Romany, Derecho Laboral: Casos y Materiales, Río Piedras, Ed. U.P.R., 1987, T. I, pág. 13. La referida disposición legal encuentra su origen en los postulados de su homologa federal, la National Labor Relations Act de 1935, según en-mendada, conocida como la Ley Wagner, 29 U.S.C.A. sec. 151 et seq., aunque difiere de esta esencialmente en ciertos aspectos.(9) Fernández y Romany, op. cit., pág. 39. Véase, *312 también, E.M. Toledo, Leyes de Relaciones del Trabajo, Hato Rey, Eds. Situm, ed. rev. 2000, págs. 3-4.
En su Art. 1, la Ley Núm. 130, supra, 29 L.P.R.A. see. 62, establece como política pública del Gobierno de Puerto Rico fomentar la negociación colectiva(10) para alcanzar el máximo desarrollo de la producción de nuestro país y así lograr los niveles más altos de vida posible para nuestra población, así como la consecución de la paz industrial, los salarios y las condiciones de empleo adecuados para los obreros puertorriqueños, y la producción ininterrumpida de artículos y servicios.(11) 29 L.P.R.A. sec. 62. *313 Véanse, también: A.E.E. v. U.T.I.E.R., 170 D.P.R. 564, 571 (2007); Plan de Salud U.I.A. v. A.A.A., 169 D.P.R. 603, 608-609 (2006). Lo anterior es cónsono con los origines y las motivaciones de la legislación inspiradora de la Ley Núm. 130 —la Ley Wagnerla cual se promulgó en res-puesta a la gran depresión económica de 1929, para esti-mular que los patronos y las uniones se sentaran en la mesa de negociación y alcanzaran acuerdos justos que propendieran a mayores niveles de producción y a un mejoramiento de la economía estadounidense. Véase M.C. Harper, S. Estreicher y J. Flynn, Labor Law: Cases, Materials, and Problems, 6ta ed., Nueva York, Ed. Aspen, 2007, pág. 87 (“Senator Wagner and some of his advisers were certainly of the view that labor organization and collective bargaining could help increase the purchasing power of workers and thereby lift the nation out of [economic] [depression”).
Asimismo, hemos establecido que la Ley Núm. 130, supra, se promulgó, además, para “reconoce[r] y protege [r] los derechos de los obreros a organizarse, negociar colectivamente y llevar a cabo actividades concertadas para su propio beneficio ...”. Cervecería Corona, Inc. v. J.S.M., 98 D.P.R. 801, 806-807 (1970). Véanse, también: A.A.A. v. Unión Abo. A.A.A, 158 D.P.R. 273, 283-284 (2002); F.S.E. v. J.R.T., 111 D.P.R. 505, 512 (1981). Así surge de su historial legislativo y de su exposición de motivos, los cuales manifiestan que la Asamblea Legislativa perseguía “fomentar la igualdad de poder contratante en- *314 tre patronos y empleados; ... proveer la conciliación, la me-diación y el arbitraje; ... [d]efinir y evitar prácticas deslea-les de trabajo[, y] proveer la solución de disputas obreras”. Exposición de Motivos de la Ley Núm. 130, supra, 1945 Leyes de Puerto Rico 407. Véanse, también: P. del S. 737 de 23 de marzo de 1945, Ira Sesión Ordinaria, 16ta Asamblea Legislativa, Actas del Senado de Puerto Rico, pág. 314; Actas de la Cámara de Representantes, domingo, 15 de abril de 1945, págs. 1690 y 1925.
El Art. 4 de la legislación bajo examen materializa la intención legislativa previamente expuesta, al disponer que
Dios empleados tienen derecho, entre otros, a organizarse en-tre sí; a constituir, afiliarse o ayudar a organizaciones obreras; negociar colectivamente a través de representantes por ellos seleccionados; y dedicarse a actividades concertadas con el propósito de negociar colectivamente u otro fin de ayuda o protección mutua. 29 L.P.R.A. sec. 65.(12)
Más aún, a estas garantías las protegen vehemente-mente las disposiciones intrínsecas a la propia Ley Núm. 130, supra. Por ejemplo, “[e]l Art. 8(l)(a) de dicha ley (29 L.P.R.A. sec. 69(l)(a)) dispone que es una práctica ilícita de trabajo el que un patrono intervenga, restrinja, ejerza coer-ción o intente intervenir, restringir, o ejercer coerción con sus empleados en el ejercicio de [los derechos consagrados *315 en el Art. 4 antes citado]”. J.R.T. v. Morales, 89 D.P.R. 777, 779 (1964).
De todo lo anterior se deducen dos fundamentos básicos que le otorgan a Ley Núm. 130, supra, su razón de ser. Primero, la legislación laboral bajo análisis persigue de forma vigorosa que el vehículo de la negociación colectiva sea el medio idóneo para alcanzar acuerdos pacíficos entre los obreros y sus patronos, que repercutan en un ambiente industrial funcional y operante, y respondan primordialmente a las necesidades de desarrollo y consumo del pueblo puertorriqueño. Segundo, el legislador también se propuso garantizar que el obrero puertorriqueño pudiese gozar de determinados derechos fundamentales (específicamente, la organización y negociación colectiva, y la celebración de actividades concertadas) que lo habiliten para negociar en igualdad de condiciones con su patrono. Véase T.J. St. Antoine, The Collective Bargaining Process, en American Labor Policy: A Critical Appraisal of the National Labor Relations Act, (Charles J. Morris, ed.), Washington, D.C., BNA Books, 1987, pág. 215 (“collective bargaining was conceived in the widespread belief that both the cause of industrial peace and the welfare of the individual employee would be promoted if workers were given a genuine voice in determining their employment conditions”). Según lo anterior, cualquier interpretación de la Ley Núm. 130, supra, requerirá una fidelidad rigurosa a estos dos fundamentos.
B. La organización y negociación colectiva: derechos de rango constitucional
Aunque la Ley Núm. 130, supra, crea un andamiaje legal que vindica el derecho de los obreros a organizarse y a negociar colectivamente, en 1952 la Asamblea Constituyente entendió prudente perpetuar tales derechos incluyéndolos en nuestra Constitución. Es por ello que en Puerto Rico —a diferencia de la jurisdicción federal— el *316 derecho a la organización y a la negociación colectiva “tiene raíces y abolengo constitucional”. J.R.T. v. Asoc. C. Playa Azul I, 117 D.P.R. 20, 33 (1986). Véanse, también: U.P.R. v. Asoc. Pur. Profs. Universitarios, 136 D.P.R. 335, 350 (1994); J.R.T. v. Asoc. Servs. Médicos Hosp., 115 D.P.R. 360, 364 (1984), citando a A.A.A. v. Unión Empleados A.A.A., 105 D.P.R. 437 (1976); Junta Reí. Trabajo v. Club Deportivo, 84 D.P.R. 515 (1962).
Como tal, los padres de nuestra Ley Suprema consagra-ron expresamente en la Sec. 17 de nuestra Carta de Dere-chos la garantía cardinal de todo empleado de una em-presa privada a la organización y a la negociación colectiva con su patrono. Art. II, Sec. 17, Const. E.L.A., L.P.R.A., Tomo 1, ed. 2008, pág. 375. Particularmente, esta disposi-ción legal establece que “[l]os trabajadores de empresas, negocios y patronos privados y de agencias o instrumenta-lidades del gobierno que funcionen como empresas o nego-cios privados tendrán el derecho a organizarse y a negociar colectivamente con sus patronos por mediación de represen-tantes de su propia y libre selección para promover su bienestar”.(13) (Enfasis suplido.) Id.
*317 Al otorgarse un rango constitucional al derecho a la ne-gociación colectiva, la referida Ley Núm. 130, supra, ha ejercido un rol complementario al Art. 17 de nuestra Carta Magna, sirviendo como la herramienta idónea “para imple-mentar las garantías y derechos reconocidos [a los obreros puertorriqueños] en nuestra Constitución”. J.R.T. v. Asoc. Seros. Médicos Hosp., supra, pág. 365. “De ahí que las dis-posiciones [de la Ley Núm. 130, supra,] deben ser interpre-tadas liberalmente en favor de la protección y fomento de [los] derechos [consagrados en la Sec. 17 de la Carta de Derechos], teniendo siempre presente que [esta ley es] parte de un esquema amplio y abarcador encaminado a implantar la directriz constitucional.” J.R.T. v. Asoc. C. Playa Azul I, supra, pág. 33, citando a Junta Reí. Trabajo v. Club Deportivo, supra, pág. 519.
El Informe de la Comisión Permanente de la Carta de Derechos de la Asamblea Constituyente (Comisión) arroja luz con relación a los principios laborales esenciales que los redactores de la Constitución pretendían surcar de forma indeleble en la Sec. 17 de nuestra Carta de Derechos, supra. Allí, la Comisión manifestó lo siguiente:
El conjunto de derechos que aquí se consigna tiene como eje central el propósito de proveer al trabajador una manera efi-caz y práctica para contratar con su patrono. El trabajador, tomado por sí solo, no está en posición económica de discutir de igual a igual con su patrono las condiciones de su empleo. El convenio colectivo mediante representantes de su propia selección, brinda al trabajador individual un instrumento equiparador de fuerzas y de responsabilidad; en virtud de él *318 los obreros quedan constituidos en una unidad y como tal uni-dad convienen colectivamente con su patrono. Los derechos aquí consignados existen en la actualidad y están expresa-mente garantizados en las leyes vigentes o implícitamente contenidos en otras disposiciones constitucionales. Se ha creído conveniente consignarlos en la carta de derechos con el fin de prevenir contra posibles vulneraciones futuras. Se reco-noce constitucionalmente, en consecuencia, que para los fines de negociar colectivamente con sus propios patronos y para cumplir sus convenios, los trabajadores de empresas y nego-cios privados y de agencias e instrumentalidades del gobierno que operen como empresas o negocios privados tendrán el de-recho a organizarse, a efectuar actividades concertadas lega-les, a establecer piquetes y a ir a la huelga. Informe de la Comisión Carta de Derechos, 4 Diario de Sesiones de la Con-vención Constituyente 2574 (1951).
Surge de las expresiones de la Comisión el interés por posicionar al obrero puertorriqueño en un sitial de poder negociador equivalente al de su patrono. De esta manera, los obreros pueden contratar de forma eficaz y práctica con sus empleadores, sin mayores trabas que el propio acto de la negociación. Además, conceder a los obreros las garan-tías constitucionales del derecho a organizarse, a efectuar actividades concertadas legales, a establecer piquetes y a ir a la huelga, afianza el andamiaje legal a favor de la negociación laboral.
El Prof. David M. Helfeld amplía lo anterior al sugerir que el derecho a la negociación colectiva consagrado en la Sec. 17 de nuestra Carta de Derechos, supra (al igual que los derechos consignados en la Sec. 18) se fundamenta en dos premisas elementales, a saber:
... en primer lugar, el trabajador individual, por lo general, no posee el mismo poder para negociar que su patrono, ni puede defenderse en contra de tratamiento patronal injusto. La se-gunda premisa es que el reconocimiento del derecho de los trabajadores a organizarse [y] negociar colectivamente ... podrí [a] colocarlos en la posición de lograr convenios colectivos que resultarían en una distribución más justa de la riqueza que producen y en defender sus intereses más efectivamente. D.M. Helfeld, La política laboral constitucional del 1952: sus *319 principios esenciales y los factores que la influenciaron, 72 (Núm. 2) Rev. Jur. U.P.R. 143, 146 (2003).
No obstante, a pesar de que el derecho a la organización y a la negociación colectiva goza de rango constitucional y su elucidación exige liberalidad “a favor de las protecciones que de él emanan” (A.A.A. v. Unión Abo. A.A.A., supra, pág. 284), tal derecho “no [es] absolutjo] y deb[e] interpretarse ‘dentro del cuadro general de la sociedad con arreglo a las limitaciones inherentes a la vida común’ ”. U.P.R. v. Asoc. Pur. Profs. Universitarios, supra, pág. 362, citando a S.I.U. de P.R. v. Otis Elevator Co., 105 D.P.R. 832, 842 (1977). Véase Diario de Sesiones, supra, pág. 2576.
Entendiendo el marco legal y constitucional que pro-mueve y faculta la negociación colectiva, pasemos a exami-nar el instrumento principal utilizado para implantar la política laboral antes esbozada: el convenio colectivo.
C. El convenio colectivo como instrumento primordial de la negociación sindical
Un convenio colectivo es “el acuerdo por escrito entre una organización obrera y un patrono en que se especifican los términos y condiciones de empleo para los trabajadores cubiertos por el contrato, el status de la organización obrera y el procedimiento para resolver las disputas que suxjan durante la vigencia del contrato”. M.M. Ballester, Vocabulario Obrero-Patronal, San Juan, Estado Libre Asociado de Puerto Rico, Departamento del Trabajo, 1962, pág. 25. Específicamente, añadimos:
The collective bargaining agreement ... may be broadly defined as an agreement between a single employer or an association of employers on the one hand and a labor union upon the other, which regulates the terms and conditions of employment. “Such agreement may be a brief statement of hours of labor and wages, or, on the other hand, it may take the form of a book ... or often an exhaustive pamphlet regulating, in the greatest minuteness, every condition under which *320 labor is to be performed, and touching upon such subjects as strikes, lockouts, walkouts, seniority, apprentices, shop conditions, safety devices and group insurance.” (Escolio omitido.) 1 Teller, Labor Disputes and Collective Bargaining Sec. 154, pág. 476 (1940).
“[E]l convenio colectivo es un contrato que, como tal, tiene fuerza de ley entre las partes suscribientes siem-pre que no contravenga las leyes, la moral y el orden público”. J.R.T. v. Junta Adm. Muelle Mun. de Ponce, 122 D.P.R. 318, 333 (1988). Al pactar su contenido, “las partes ... debe[n] cumplir [lo] con estricta rigurosidad”. Corp. P.R. Dif. Púb. v. U.G.T., 156 D.P.R. 631, 638 (2002), opinión de conformidad del Juez Asociado Señor Rivera Pérez, a la cual se une el Juez Asociado Señor Corrada del Río. Véanse, también: 29 L.P.R.A. see. 62; Martínez Rodríguez v. A.E.E., 133 D.P.R. 986, 995 (1993); Rivera Adorno v. Autoridad de Tierras, 83 D.P.R. 258, 264-265 (1961); Steelworkers v. Enterprise Corp., 363 U.S. 593 (1960). “[E]l convenio colectivo obliga al patrono, a la [u]nión y a los miembros individuales de la [u]nión.” San Juan Mercantile Corp. v. J.R.T., 104 D.P.R. 86, 89 (1975). Como resultado, “ni el patrono ni los obreros pueden pretender beneficiarse de ciertas cláusulas ... y rechazar otras”. Id.
A pesar de la naturaleza contractual de los convenios laborales, estos no se pueden catalogar como meros pactos que articulan derechos individuales de los empleados, sino que se deben considerar instrumentos que crean relaciones e intereses a la luz de la política laboral estatal. Bowen v. United States Postal Service, 459 U.S. 212, 220 (1983) (“a collective-bargaining agreement is much more than traditional common-law employment terminable at will. Rather, it is an agreement creating relationships and interests under the federal common-law of labor policy”); Steelworkers v. Warrior & Gulf Co., 363 U.S. 574, 578 (1960) (“The collective bargaining agreement states the rights and duties of the parties. It is more than a contract; *321 it is a generalized code to govern a myriad of cases which the draftsmen cannot wholly anticipate”).
Consecuentemente, “[1] a Asamblea Legislativa de Puerto Rico ha considerado los convenios colectivos como instrumentos para la promoción de la política pública laboral del Gobierno”. J.R.T. v. Junta Adm. Muelle Mun. de Ponce, supra, pág. 330. Véanse: P.R. Telephone v. Junta Relaciones Trabajo, 86 D.P.R. 382 (1962); 29 L.P.R.A. sec. 62(5). “Por dicha razón, los convenios colectivos están revestidos de un alto interés público.” Corp. P.R. Dif. Púb. v. U.G. T, supra, pág. 638. Ello, pues la celebración de los contratos laborales fomenta “la paz industrial a través de medios adecuados que ayud[a]n a resolver de forma pacífica las controversias obrero-patronales”. Id. De acuerdo con lo anterior, cuando ambas partes, al firmar el convenio colectivo, se comprometen a someter al procedimiento de arbitraje cualquier queja y agravio que suija entre ellas, tal cláusula las obliga por igual —Pérez v. Autoridad Fuentes Fluviales, 87 D.P.R. 118, 124 (1963) — (14) y los tribunales estamos llamados a brindar a lo pactado “el más entusiasta endoso” (U.I.L. de Ponce v. Dest. Serrállés, Inc., 116 D.P.R. 348, 352 (1985)).
Ahora bien, ya que en el caso de autos las partes pacta-ron someter al procedimiento de arbitraje cualquier contro-versia que surgiera por el despido de un empleado (Apén-dice del Recurso de certiorari, págs. 133-137), abordamos a continuación los principios fundamentales del arbitraje obrero-patronal según dispone nuestro ordenamiento legal.
*322 D. Principios generales del arbitraje obrero-patronal(15)
En su concepción más abarcadora, el arbitraje constituye “la alternativa existente más formal a la adjudicación y [al] litigio judicial. En este proceso, las partes en disputa someten y presentan su caso ante un tercero neutral que está investido con la facultad de rendir una decisión”.(16) D. Fernández Quiñones, El Arbitraje Obreropatronal, Colombia, Ed. Forum, 2000, pág. 9. El arbitraje obrero-patronal se distingue —de entre varias modalidades del arbitraje — (17) por ser un “sustituto del uso de la *323 fuerza económica como solución a las disputas que surjan durante la vida del convenio colectivo” y por representar un medio pacífico que hace efectivo el proceso de la nego-ciación sindical.(18) Id., pág. 21, citando a H. Shulman, Reason, Contract and Law in Labor Relations, 68 Harv. L. Rev. 999, 1024 (1955). Véase, también, Textile Workers v. Lincoln Mills, 353 U.S. 448, 455 (1957) (“the agreement to arbitrate grievance disputes is the quid pro quo for an agreement not to strike”).
Nuestro ordenamiento jurídico favorece vehementemente el uso del arbitraje obrero-patronal como sustituto del litigio judicial. Como fe de lo anterior,
[La Ley Núm. 130, supra,] ... hace referencia específica al ar-bitraje en tres ocasiones. Ellas tratan de las prácticas ilícitas del trabajo para patronos y organizaciones obreras que dispo-nen sobre violación de convenio colectivo, que incluye el no acatar un laudo de arbitraje, sea éste producto de un arbitraje delineado en el contrato colectivo o de un procedimiento de arbitraje ad hoc. La otra instancia en que se menciona el ar-bitraje es en la disposición que faculta al organismo adminis-trativo para solicitar el cumplimiento judicial del laudo en el caso en que la parte perdidosa se niegue a acatarlo. Se implica el arbitraje en la Declaración de Política Pública de la ley al promover que patronos y uniones dispongan “de los medios adecuados para resolver pacíficamente las controversias”. (Escolios omitidos.) Fernández Quiñones, op. cit., pág. 20, citando a 29 L.P.R.A. secs. 61, 62(2) y 69(l)(f) y 2(a).
Igualmente, esta Curia ha establecido que “el arbitraje *324 de las controversias laborales bajo los términos de los con-venios colectivos es [una pieza] integrante del proceso de negociación colectiva”. Pérez v. Autoridad Fuentes Fluvia-les, supra, págs. 124-125. Como mecanismo de solución de disputas, el arbitraje obrero-patronal representa un medio más apropiado que los tribunales para resolver las contro-versias que emanan de la relación contractual entre las partes, ya que es menos técnico, más flexible y menos oneroso. Véase Vélez v. Serv. Legales de P.R., Inc., 144 D.P.R. 673, 682 (1998). Lo anterior faculta que se cumpla con la política pública laboral imperante en esta jurisdic-ción, la cual exige que “las controversias laborales tengan rápida adjudicación y pronto fin”. J.R.T. v. P.R. Telephone Co., Inc., 107 D.P.R. 76, 81 (1978). Es por ello que recono-cemos como norma general la política laboral favorable a todo acuerdo de arbitraje que nace de un convenio pactado entre el patrono y la unión. Vélez v. Serv. Legales de P.R., Inc., supra, pág. 682.
De lo antepuesto surge que el arbitraje laboral es, pre-dominantemente, un producto de la contratación privada entre uniones y patronos. F. Elkouri y E. Elkouri, How Arbitration Works, 6ta ed., Washington, D.C., BNA Books, 2003, pág. 46. Como resultado, la decisión de someter la controversia ante un árbitro nace de la voluntad de las partes y no se origina —aunque sí es fomentado— me-diante el mandato legislativo. Steelworkers v. Warrior & Gulf Co., supra, pág. 582 (“arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit”). Véase, también, VDE Corporation v. F & R Contractors, 180 D.P.R. 21 (2010). En nuestra jurisdicción, la inclusión voluntaria del arbitraje en el convenio colectivo es la norma en la mayoría de los contratos sindicales.(19) Fer- *325 nández Quiñones, op. cit, págs. 33-34 (“El arbitraje com-pulsorio no tiene cabida en el ámbito laboral porque está en pugna abierta con la filosofía imperante de la negocia-ción colectiva. ... Ese tipo de arbitraje se utiliza en la le-gislación del sector público que le garantiza la negociación colectiva a determinados empleados ...”).
Ordinariamente, el arbitraje obrero-patronal constituye el último eslabón de una cadena de eventos pertenecientes a un procedimiento de quejas y agravios previamente deli-neado en el convenio colectivo.(20) Elkouri y Elkouri, op. cit., pág. 198. En términos generales, dicho procedimiento consiste en lo siguiente:
Grievances ordinarily are taken by the aggrieved employee, ... with ... a union representative, to the first-line supervisor, and if no settlement is reached, [they] may be appealed through successive steps of the management hierarchy and, in most cases, then taken to arbitration(21) Elkouri y Elkouri, op. cit., pág. 214.
El Tribunal Supremo federal se ha expresado sobre tal procedimiento de la manera siguiente: “[the grievance procedure] is, in other words, a part of the continuous collective bargaining process. It, rather than a strike, is the terminal point of a disagreement.” Steelworkers v. Warrior & Gulf Co., supra, pág. 581.
*326 Claro está, es imperativo recordar que, al ser el proce-dimiento de quejas y agravios un elemento forjado por la voluntad de las partes contratantes, cada convenio conten-drá el método de resolución de disputas que mejor res-ponda a los intereses de las partes. Elkouri y Elkouri, op. cit., pág. 214. Sin embargo, si por alguna razón la disputa sobrevive alguno de los pasos anteriores, la norma general apunta a incluir al arbitraje como el paso final del proce-dimiento explicado. En ocasiones —como ocurre en el caso de autos— “[l]os contratos proveen para que se omitan eta-pas con miras a expeditar los agravios. Ello suele acontecer en casos de despido o casos que suscitan cuestiones de seguridad”. Fernández Quiñones, op. cit., pág. 36.
E. La figura del árbitro y las implicaciones de su laudo
Una vez se somete la disputa ante un árbitro para su resolución, las partes, en efecto, sustituyen a las cortes por el árbitro “ ‘para la determinación de todas las cuestiones de hecho y de derecho sustantivo y renuncian al derecho a litigar tales cuestiones ante los tribunales ...’ ”.(22) López v. Destilería Serrallés, 90 D.P.R. 245, 256 (1964). Véanse, también: Condado Plaza v. Asoc. Emp. Casinos P.R., 149 D.P.R. 347, 352 (1999); Rivera Adorno v. Autoridad de Tierras, 83 D.P.R. 258 (1961); J.R.T. v. Central Mercedita, Inc., 94 D.P.R. 502 (1967); Junta de Relaciones del Trabajo v. N.Y. & P.R. S/S Co., 69 D.P.R. 782, 800 (1949). Lo anterior se debe a lo siguiente:
“The labor arbitrator performs functions which are not normal to the courts; the considerations which help him fashion judgments may indeed be foreign to the competence of courts.” Steelworkers v. Warrior & Gulf Co., supra, pág. 581.
Además, debemos tener presente que el árbitro goza de un peritaje y conocimiento especializados ajenos a los jue- *327 ces, lo que agiliza el proceso adjudicativo y garantiza una pronta disposición de la disputa laboral. (23) El Tribunal Supremo federal ha delineado el carácter de la función del árbitro en el proceso de arbitraje obrero-patronal. Por voz del Juez Douglas, el Foro Supremo federal expuso:
“A proper conception of the arbitrator’s function is basic. He is not a public tribunal imposed upon the parties by superior authority which the parties are obliged to accept. He has no general charter to administer justice for a community which transcends the parties. He is rather part of a system of self-government created by and confined to the parties ...” (Énfasis suplido.) Steelworkers v. Warrior & Gulf Co., supra, pág. 581.
Como participante de ese sistema de auto-gdber-nanza creado y limitado a las partes, “[l]a función principal del árbitro ... es interpretar las clausulas [del] conveni[o] colectiv[o]”. J.R.T. v. Junta Adm. Muelle Mun. de Ponce, supra, págs. 330-331.(24) Al ejercer esta función, el árbitro *328 se debe adherir a la esencia del convenio colectivo y el acuerdo de sumisión. Junta Relaciones del Trabajo v. N.Y. & P.R. S./S. Co., supra, pág. 804. Véase, también, Elkouri y Elkouri, op. cit., pág. 428 (“[T]he agreement itself is the point of concentration, and the function of the arbitrator is to interpret and apply its provisions”). (Énfasis suplido.) Luego de interpretar el contrato colectivo, la decisión final del árbitro estará plasmada en el laudo de arbitraje, el cual “no es ni un contrato ni una sentencia, pero disfruta de la naturaleza de ambos”. Junta Relaciones del Trabajo v. N.Y. & P.R. S./S. Co., supra, pág. 797. Tan pronto se complete y emita el laudo, “[l]a autoridad y jurisdicción del árbitro concluye ...”. Fernández Quiñones, op. cit., pág. 54.
F. La revisión judicial de un laudo de arbitraje
Los tribunales confieren gran deferencia a las interpretaciones que haga el árbitro en el laudo de arbitraje relacionado a lo acordado en el convenio colectivo. Condado Plaza v. Asoc. Emp. Casinos, supra, pág. 352. Véanse, también: Steelworkers v. American Mfg. Co., 363 U.S. 564, 567 (1960); J.R.T. v. Junta Adm. Muelle Mun. de Ponce, supra, pág. 325; Elkouri y Elkouri, op. cit., pág. 954. Por tal razón, la revisión judicial de los laudos emitidos en el procedimiento de arbitraje se limitará a las instancias en las cuales quede demostrada la existencia de fraude, conducta impropia del árbitro, falta del debido proceso de ley, ausencia de jurisdicción, omisión de resolver todas las cuestiones en disputa o que el laudo sea contrario a la política pública. S.I.U. de P.R. v. Otis Elevator Co., supra, pág. 836. Véanse, también: Rivera Adorno v. Autoridad de Tierras, 83 D.P.R. 258, 266 esc. 3. (1961); Junta Relaciones del Trabajo v. N.Y. & P.R. S./S. Co., supra, pág. 800. Lo anterior implica que “un laudo no puede anularse por meros errores de criterio ya sean éstos en cuanto a la ley o en *329 cuanto a los hechos”.(25) Autoridad Sobre Hogares v. Tribl. Superior, 82 D.P.R. 344, 353 (1961). Véase Paperworkers v. Misco, Inc., 484 U.S. 29, 36 (1987).
No obstante, cuando un convenio colectivo dis-pone que el laudo se emita conforme a derecho, la intervención judicial en la revisión del laudo está ampliamente justificada. Fernández Quiñones, op. cit., pág. 566. Véase, también, Junta Relaciones del Trabajo v. N.Y. & P.R. S./S. Co., supra, págs. 801-802. Que un laudo se emita conforme a derecho implica que “el árbitro viene obligado a seguir las reglas de derecho y rendir [su decisión] a tenor con las doctrinas legales prevalecientes”. (Énfasis suplido.) Fernández Quiñones, op. cit., pág. 564, citando a Junta Relaciones del Trabajo v. N.Y. & P.R. S./S. Co., supra, pág. 802. En términos concretos, esto significa que
... el árbitro no puede ignorar las normas interpretativas de derecho sustantivo emitidas por los Tribunales Supremos de Estados Unidos y Puerto Rico en el campo de derecho laboral, y que se reputarán persuasivas las decisiones de los tribunales de primera instancia y de agencias administrativas, y los lau-dos y escritos de reputados árbitros. (Énfasis suplido.) J.R.T. v. Hato Rey Psychiatric Hosp., 119 D.P.R. 62, 68 (1987).
Por consiguiente, “las decisiones del árbitro [que sean] contrarias a las leyes y ‘normas interpretativas de derecho sustantivo [,] emitidas por los Tribunales Supremos de Estados Unidos y Puerto Rico en el campo de dere- *330 cho laboral’[,] invalidan jurídicamente” la decisión arbitral. J.R.T. v. Vigilantes, Inc., 125 D.P.R. 581, 593 (1990).
G. Las facultades remediadoras de un árbitro cuando el laudo debe emitirse conforme a derecho
Los tribunales debemos considerar que, dentro del procedimiento de arbitraje obrero-patronal, las facultades decisorias y remediadoras del árbitro “emanan del acuerdo de sumisión y del convenio colectivo existente entre patrono y unión”. Sonic Knitting Industries v. I.L.G.W.U., 106 D.P.R. 557, 561 (1977), citando a J.R.T. v. Otis Elevator Co., 105 D.P.R. 195 (1976); Colón Molinary v. A.A.A., 103 D.P.R. 143, 148-149 (1974); Junta Relaciones del Trabajo v. N.Y. & P.R. S./S. Co., supra; Steelworkers v. Enterprise Corp., supra, pág. 597. Como tal, cuando el convenio no exige que el laudo sea emitido conforme a derecho, los árbitros tienen “amplia autoridad para diseñar un remedio adecuado al laudo que emite [n]; claro está, siempre y cuando el remedio sea consustancial con el convenio colectivo y el acuerdo de sumisión por el cual se actúa”. (Enfasis en el original.) H.I.E.Tel. v. Celulares, 169 D.P.R. 1, 27 (2006), Sentencia y Opinión de conformidad de la Juez Asociada Señora Rodríguez Rodríguez.
Esta amplitud de facultades remediadoras en casos donde el convenio colectivo no requiere que el laudo se emita conforme a derecho, encuentra su justificación en los casos normativos del Tribunal Supremo federal, mejor conocidos como la “trilogía Steelworkers”,(26) Estos establecen que los árbitros disfrutan de una vasta latitud al momento de otorgar remedios, siempre y cuando estos cumplan con la esencia del convenio colectivo y el acuerdo de sumisión. *331 Steelworkers v. Enterprise Corp., supra. Concretamente, el máximo foro federal ha expresado lo siguiente:
When an arbitrator is commissioned to interpret and apply the collective bargaining agreement, he is to bring his informed judgment to bear in order to reach a fair solution of a problem. This is especially true when it comes to formulating remedies. There the need is for flexibility in meeting a wide variety of situations. The draftsmen may never have thought of what specific remedy should be awarded to meet a particular contingency. Nevertheless, an arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice. He may of course look for guidance from many sources, yet his award is legitimate only so long as it draws its essence from the collective bargaining agreement. "When the arbitrator’s words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award. (Enfasis suplido.) Steelworkers v. Enterprise Corp., supra, pág. 597.
En Ludwig Honold Mfg. Co. v. Fletcher, infra, el Tribunal Federal de Apelaciones para el Tercer Circuito proveyó una definición útil de lo que implica que un remedio derive su esencia del convenio colectivo. El Tribunal explicó:
... a labor arbitrator’s award does “draw its essence from the collective bargaining agreement” if the interpretation can in any rational way be derived from the agreement, viewed in the light of its language, its context, and any other indicia of the parties’ intention; only where there is a manifest disregard of the agreement, totally unsupported by principles of contract construction and the law of the shop, may a reviewing court disturb the award. Ludwig Honold Mfg. Co. v. Fletcher, 405 F.2d 1123, 1128 (1969). Véase, también, R.J. Schoonhoven, Fairweather’s Practice and Procedure in Labor Arbitration, Washington, D.C., BNA Books, 1999, pág. 553.
Además, el caso provee que, a diferencia de un simple error en la interpretación del derecho (lo cual no concede justificación alguna para trastocar un laudo de arbitraje), cuando el remedio provisto por el árbitro representa un *332 “manifest disregard of the law”, éste no merece la deferen-cia del Tribunal. (Énfasis suplido.) Ludwig Honold Mfg. Co. v. Fletcher, supra, pág. 1128.
Todo lo anterior establece que, al interpretar el convenio colectivo, los árbitros gozan de la flexibilidad necesaria para crear remedios que respondan a una variedad de situaciones que las partes no atendieron expresamente en el convenio laboral. Sin embargo, esa flexibilidad no es irrestricta. Las facultades remediadoras del árbitro, aun cuando el laudo no exija ser emitido conforme a derecho, deben obtener su esencia del convenio colectivo y del laudo de arbitraje, lo cual requiere que el árbitro examine el convenio según su lenguaje, contexto y cualquier otro indicio de la intención de los contratantes.
Con mayor razón, si un laudo se dehe emitir conforme a derecho, la esencia del convenio exige que el remedio otorgado y la decisión final del árbitro estén condicionados por las disposiciones legales vigentes en nuestro ordenamiento legal, ya que así lo han pactado las partes. Así ocurre con la interpretación del término justa causa cuando las partes pactan que el laudo se emita conforme a derecho. Según el Prof. Demetrio Fernández Quiñones,
[s]i las partes le requieren al árbitro que resuelva conforme a derecho, él vendrá obligado a aplicar las normas y doctrinas legales prevalecientes en esta jurisdicción. Ello implica que el árbitro tendrá que recurrir a la Ley de Despido Injustificado [, Ley Núm. 80, supra,] para obtener la definición sobre justa causa que ha establecido el Tribunal Supremo. Fernández Quiñones, op. cit, pág. 217.
Como resultado, si el término justa causa en un conve-nio que exige que el laudo se emita conforme a derecho se debe interpretar según los postulados de la Ley Núm. 80, supra, y su jurisprudencia interpretativa, igualmente los remedios que conceda el árbitro en este contexto se deben ceñir a la indemnización mínima que provee esta ley. De acuerdo con estas consideraciones, conceder remedios adi- *333 dónales, como la reposición en el empleo y el pago de ha-beres dejados de percibir durante el periodo de destitución, representa un repudio manifiesto del derecho aplicable, el cual exige corrección judicial, y no un simple error de in-terpretación legal.
No es la primera vez que este Tribunal se enfrenta a esta controversia. En el pasado, mediante Sentencia y divididos en criterios, un número de miembros de este Foro reconoció que un árbitro tenía facultad para conceder el remedio de la reposición de un empleado en su antiguo puesto y el cobro de los salarios dejados de percibir mien-tras estuvo destituido injustificadamente, porque así lo dispone una lectura integral y expresa del convenio colectivo. En aquella ocasión, la distinguida compañera y Juez Asociada, Hon. Anabelle Rodríguez Rodríguez, me-diante una opinión de conformidad, a la cual se unieron el distinguido Juez Presidente, Hon. Federico Hernández Denton, y el Juez Asociado, Hon. Jaime B. Fuster Berlin-geri, expuso lo siguiente:
... cuando el convenio colectivo claramente ordena que el laudo sea conforme a derecho, sin más, el remedio exclusivo tiene que ser lo que la [Ley Núm. 80, supra], provee; es decir, la mesada.
Si por el contrario, el convenio colectivo o el acuerdo de su-misión no requieren que el laudo sea conforme a derecho y guardan silencio respecto a la facultad remedial del árbitro, éste podrá conceder el remedio que estime procedente, inclu-yendo la reposición y la paga atrasada. Ello necesariamente debe ser así ya que los árbitros tienen amplia latitud para la confección de remedios que adelanten los objetivos plasmados en el convenio colectivo. Esta facultad está subsumida dentro de su capacidad para formular el remedio apropiado. H.I.E.Tel. v. Celulares, supra, págs. 30-31.(27)
*334 Lo anterior da paso a tres posibilidades, a saber: (1) que el convenio colectivo y el acuerdo de sumisión no condicio-nen el laudo para que se emita conforme a derecho y que tampoco dispongan las facultades remediadoras del árbi-tro; (2) que el convenio colectivo y el acuerdo de sumisión condicionen el laudo para que se emita conforme a derecho, y que expresamente dispongan que el árbitro puede conce-der remedios adicionales como, por ejemplo, la reposición en el empleo y el cobro de salarios dejados de percibir, y (3) que el convenio colectivo o el acuerdo de sumisión exijan que el laudo se emita conforme a derecho, pero que nada se diga sobre los poderes del árbitro para diseñar remedios.
La primera de estas posibilidades se consideró en J.R.T. v. Securitas, Inc., 111 D.P.R. 580 (1981). Allí, debido a que el convenio colectivo no disponía que el laudo se debía emi-tir conforme a derecho, y por no limitarse las facultades remediadoras del árbitro, reconocimos a este último la po-testad de otorgar como remedio la reposición del empleado destituido en su empleo al igual que la paga de salarios dejados de percibir. Para fundamentar nuestra determina-ción, dispusimos que
[n]o se nos ha demostrado qne la intención legislativa [al apro-bar la Ley Núm. 80] haya sido fijar sanciones máximas exclu-sivas para casos de despido cuando media un convenio colec-tivo y un amplio acuerdo de sumisión sobre la justificación de la cesantía. ¿Cómo es que puede interpretarse que la legisla-ción sobre la mesada ha obedecido por décadas al propósito de impedir que un árbitro, bajo un acuerdo de sumisión [y un convenio] que no limite claramente sus poderes, ordene la re-posición de un empleado y el pago de los sueldos dejados de percibir ...? (Énfasis suplido.) íd., pág. 583. Véase, también, H.I.E.Tel. v. Celulares, supra, pág. 30.
Esto implica que cuando el acuerdo de sumisión o el convenio colectivo no limiten los poderes de un árbitro para diseñar remedios, y cuando estos no exijan que el laudo emitido sea conforme a derecho, procede reconocer al árbi- *335 tro una amplia discreción para elaborar remedios que de-sarrollen los objetivos concretados en el convenio colectivo.
La segunda posibilidad se atendió en J.R.T. v. Caribbean Towers, Inc., 99 D.P.R. 595 (1971). Én aquella oca-sión analizábamos un convenio colectivo que requería que el laudo se emitiese conforme a derecho y concedía al árbi-tro, expresamente, las facultades remediadoras de reposi-ción en el empleo y paga atrasada. Mediante nuestro dic-tamen, reconocimos al árbitro la jurisdicción conferida por las partes para que ordenara los remedios señalados, por-que así expresamente lo dispuso el convenio colectivo. Id., págs. 597-598. Más aún, en aquella ocasión añadimos que, cuando “[e]n el convenio se especifica que el árbitro viene obligado a decidir conforme a derecho, [e]l acuerdo de su-misión unido al convenio establecen ... la ley para las par-tes en el procedimiento de arbitraje”. íd., pág. 598. Por consiguiente, ante tales condiciones, el árbitro no puede aventurar más allá de los límites jurídicos que pactaron las partes.
Relativo a la tercera posibilidad examinada en el caso de autos —que el convenio colectivo o el acuerdo de sumi-sión exijan que el laudo se emita conforme a derecho, pero que nada se diga sobre los poderes del árbitro para diseñar remedios— resolvemos que lo procedente es limitar el re-medio arbitral a la indemnización mínima de la mesada. Esto es cónsono con la política pública a favor de la nego-ciación colectiva, ya que son las partes y no el árbitro o los tribunales las que han pactado adherirse a lo mínimo que ofrece nuestro ordenamiento jurídico, sin más. (28)
*336 H. La doctrina del remedio exclusivo de la mesada y sus excepciones
La Ley de Despido Injustificado, Ley Núm. 80, supra, provee para que, además del sueldo devengado, el patrono compense (mediante la comúnmente denominada “mesada”) a todo empleado que trabaje mediante remuneración de alguna clase y que sea contratado por tiempo indeterminado, en caso de ser despedido sin justa causa. (29) 29 L.P.R.A. sec. 185a.
Al momento del despido del señor Lugo Reyes, la me-sada consistía, esencialmente, en otorgar al empleado:
*337 (a) [e]l sueldo correspondiente a un mes por concepto de in-demnización si el despido [ocurría] dentro de los primeros cinco (5) años de servicio; el sueldo correspondiente a dos (2) meses si el despido [ocurría] luego de los cinco (5) años hasta los quince (15) años de servicio; el sueldo correspondiente a tres (3) meses si el despido [ocurría] luego de los quince (15) años de servicio;
(b) una indemnización progresiva adicional equivalente a una semana por cada año de servicio.(30) 29 L.P.R.A. sec. 185a (ed. 1995) (Sup. 1997).
Como norma general, el remedio previamente indicado representa la única compensación disponible para un em-pleado contra los actos o las omisiones de un patrono rela-cionadas con el despido injustificado. Rivera v. Security Nat. Life Ins. Co., 106 D.P.R. 517, 527 (1977). Véanse, también: Acevedo v. Western Digital Caribe, Inc., 140 D.P.R. 452, 459 (1996); Vélez Rodríguez v. Pueblo Int’l, Inc., 135 D.P.R. 500, 511 (1994).
No obstante, existen tres excepciones a la norma del remedio único de la mesada, a saber: (1) los remedios adicionales conferidos por conducta torticera del patrono, *338 ajena a la mera violación de una disposición de las leyes del trabajo (Rivera v. Security Nat. Life Ins. Co., supra, pág. 527); (2) los remedios adicionales provistos por leyes especiales (Vélez Rodríguez v. Pueblo Int’l, Inc., supra, pág. 511), y (3) los remedios adicionales concedidos por un des-pido cuyo propósito e intención principal sea subvertir una clara política pública del Estado o algún derecho constitucional (Soc. de Gananciales v. Royal Bank de P.R., 145 D.P.R. 178, 192 (1998); Porto y Siurano v. Bentley P.R., Inc., 132 D.P.R. 331, 342 (1992); Arroyo v. Rattan Specialties, Inc., 117 D.P.R. 35, 65 (1986)). De no establecer satis-factoriamente alguna de las tres excepciones indicadas, el empleado solo será acreedor al pago mínimo de la mesada.
La Ley Núm. 130, supra, concede al patrono y a la unión la oportunidad de ensanchar la protección mínima que ofrece la Ley Núm. 80, supra, al empleado despedido injustamente. Mediante la negociación colectiva, las partes pueden pactar en el convenio que el empleado reciba mayores beneficios y protecciones con relación a su seguridad en el empleo. J.R.T. v. Vigilantes, Inc., supra, pág. 593. No obstante, y como ya hemos dispuesto anteriormente, cuando el laudo debe ser conforme a derecho, tales protecciones acrecentadas deben surgir expresamente del convenio colectivo o del acuerdo de sumisión, disponiendo que proceden beneficios más allá de lo mínimo que provee la Ley Núm. 80, supra. De lo contrario, nuestro estado de derecho actual solo ofrece la mesada.
I. Penalidades, honorarios, intereses y costas
Por último, surge del expediente que la peticionaria re-clama el pago de costas, gastos, intereses legales y honora-rios de abogado por temeridad, y honorarios profesionales a razón de un 25% de la cuantía total adeudada al señor Lugo Reyes.(31) Además, la peticionaria arguye que por ley, *339 y como penalidad, el señor Lugo Reyes es acreedor a que el patrono le pague una cantidad igual a la adjudicada por los salarios dejados de devengar durante el término de su destitución.(32) A continuación, esbozamos el derecho apli-cable para las figuras reseñadas.
El Art. 3 de la Ley Núm. 402 de 12 de mayo de 1950 (Ley Núm. 402), 32 L.P.R.A. sec. 3116, conocida como la Ley de Reclamaciones Laborales, declara que
[s]erán nulos y contrarios al orden público todos los contratos, convenios o acuerdos en que trabajadores o empleados se obli-guen directa o indirectamente a pagar honorarios a sus abo-gados en casos de reclamaciones judiciales o extrajudiciales contra sus patronos bajo la legislación laboral de Puerto Rico o bajo la legislación laboral del Congreso de Estados Unidos aplicable a Puerto Rico, o al amparo de un convenio de natu-raleza individual o colectiv[a].
La intención legislativa tras la citada disposición legal responde a que “permitir el cobro de honorarios de abogado a los trabajadores o empleados que se ven en la necesidad de reclamar contra sus patronos, ... equivale a permitir que se reduzca el valor de su trabajo en la cantidad que paguen a sus abogados”. 32 L.P.R.A. see. 3114. Como resultado, ante una reclamación laboral en la cual el abogado representa al obrero perjudicado, el tribunal fijará los honorarios profesionales para que el patrono los pague.(33) 32 L.P.R.A. see. 3115; López Vicil v. ITT Intermedia, Inc., 143 D.P.R. 574, 587 (1997).
*340 La Ley Núm. 402, supra, omite establecer criterio alguno que guíe a los tribunales en su encomienda de fijar los honorarios de abogado que deberá pagar el patrono. Como resultado, en López Vicil v. ITT Intermedia, Inc., supra, mediante el uso de la analogía, salvamos el vacío legislativo antes explicado al resolver que "la cuantía que pod[ía] recibir el abogado de un trabajador victorioso en una reclamación al amparo de la Ley Núm. 100 [de 30 de junio de 1959 (29 L.P.R.A see. 146 et seq.)\ sería el ... (25%) de la indemnización base concedida al trabajador”.(34) íd., pág. 582. En aquella ocasión arribamos a este porcentaje considerando como referencia el 15% de honorarios de abogado dispuesto por la Ley Núm. 80, supra, y comparando el grado de complicación y el costo superior que implica litigar un caso de discrimen bajo la Ley Núm. 100, supra, vis-á-vis un pleito de despido injustificado bajo la Ley Núm. 80, supra. Id.
La Ley Núm. 80, supra, antes de ser enmendada en el 2005, dictaminaba explícitamente que "cuando el tribunal [establecía] que el despido fue efectuado sin justa causa, éste ordenarla] al patrono depositar una suma para hono-rarios de abogado, no menor del quince por ciento (15%) del total de la compensación del trabajador”. (Enfasis en el original.) López Vicil v. ITT Intermedia, Inc., supra, pág. 582, citando a 29 L.P.R.A. sec. 185k(b). En el 2005, la Ley Núm. 128 de 7 de octubre alteró el Art. 11 de la Ley Núm. 80, supra, sin mencionar un porciento específico para el *341 pago de honorarios, disponiendo en su lugar que, de no existir justa causa para el despido, “el patrono demandado [deberá] depositor] en la secretaría del tribunal ... una cantidad para honorarios de abogado que nunca será menor del por ciento del total de la compensación o cien dólares ($100), la que fuere mayor”. (Enfasis suplido.) 29 L.P.R.A. sec. 185(k)(b). Ante la omisión del legislador de explicitar determinado porcentaje, resolvimos en Hernández Maldonado v. Taco Maker, 181 D.P.R. 281 (2011), mantener la norma previa dispuesta por la Ley Núm. 80, supra, antes de ser enmendada en el 2005, la cual proveía para una cuantía por honorarios de abogado no menor del quince por ciento (15%) del total de la compensación del trabajador o cien dólares, la que sea mayor. Como bien dis-pusimos en el caso reseñado, tal será la norma hasta que la Asamblea Legislativa disponga otra cosa. Id.
Cuando un convenio colectivo requiera que el laudo de arbitraje se emita conforme a derecho y permanezca silente con relación al cobro y pago de honorarios de abogado, si el laudo de arbitraje resuelve que el despido de determinado empleado fue sin justa causa, procede aplicar el contenido mínimo de la Ley Núm. 80, supra. Como tal, no tan solo la definición del término justa causa y la doctrina del remedio exclusivo de la mesada limitarán el laudo de arbitraje que emita el árbitro, sino que, al disponer sobre los honorarios de abogado, este deberá aplicar la norma dispuesta en Hernández Maldonado v. Taco Maker, supra, la cual exige una cuantía por honorarios de abogado no menor del quince por ciento del total de la compensación del trabajador o cien dólares, la que sea mayor.
En cuanto a la imposición de honorarios de abogado e intereses por temeridad, las Reglas de Procedimiento Civil establecen que es imprescindible que la parte contra quien se reclaman tales partidas haya actuado con temeridad o frivolidad. Véanse: Reglas 44.1(d) y 44.3 de *342 Procedimiento Civil, 32 L.P.R.A. Ap. V.(35) Hemos indicado que “el concepto temeridad se refiere a las actuaciones de una parte que hacen necesario un pleito que se pudo evitar o que provocan su indebida prolongación”. Colón Santos v. Coop. Seg. Múlt. P.R., 173 D.P.R. 170, 178 (2008). Véase Blás v. Hosp. Guadalupe, 146 D.P.R. 267, 335 (1998). De igual forma, este Tribunal ha establecido que “un litigante actúa con temeridad cuando con ‘terquedad, obstinación, contumacia e insistencia en una actitud desprovista de fundamentos, obliga a la otra parte, innecesariamente, a asumir las molestias, gastos, trabajo e inconvenientes de un pleito’ ”. S.L.G. Flores-Jiménez v. Colberg, 173 D.P.R. 843, 866 (2008). Véanse: Rivera v. Tiendas Pitusa, Inc., 148 D.P.R. 695, 701 (1999); Domínguez, v. GA Life, 157 D.P.R. 690, 706 (2002).
En Blás v. Hosp. Guadalupe, supra, págs. 335-336, esta Curia señaló
[ciertas] instancias bajo las cuales existe temeridad, a saber: (1) contestar una demanda y negar responsabilidad total, aun-que se acepte posteriormente; (2) defenderse injustificada-mente de la acción; (3) creer que la cantidad reclamada es exagerada y que sea esa la única razón que se tiene para opo-nerse a las peticiones del demandante sin admitir franca-mente su responsabilidad, pudiendo limitar la controversia a la fijación de la cuantía a ser concedida; (4) arriesgarse a liti-gar un caso del que se desprendía prima facie su responsabi-lidad, y (5) negar un hecho que le conste es cierto a quien hace la alegación. Véase Fernández v. San Juan Cement Co., Inc., 118 D.P.R. 713, 719 (1987).
 Al imponer honorarios de abogado a la parte te-meraria, los tribunales descansarán en su discreción y de-terminarán la cuantía que aplicarán por: (1) el grado de temeridad; (2) el trabajo realizado; (3) la duración y natu- *343 raleza del litigio; (4) la cuantía involucrada, y (5) el nivel profesional de los abogados. R. Hernández Colón, Derecho Procesal Civil, San Juan, Ed. LexisNexis, 2010, See. 4402. Véanse: Blás v. Hosp. La Guadalupe, supra; Velázquez Ortiz v. U.P.R., 128 D.P.R. 234 (1991); Sucn. Trías v. P.R. Leaf Tobacco Co., 59 D.P.R. 229 (1941).
Por otra parte, la Regla 44.3(a) de Procedimiento Civil de 2009 (32 L.P.R.A. Ap. V) establece que se impondrán intereses mandatoriamente en toda sentencia que ordena el pago de dinero, computados sobre la cuantía de la sentencia desde la fecha cuando se dictó sentencia y hasta que ésta se satisfaga, incluso las costas y los honorarios de abogado.(36) Véase, también, Rodríguez Sanabria v. Soler Vargas, 135 D.P.R. 779 (1994). Según dispone esta regla, el pago de intereses que se impondrá será al tipo que fije por reglamento la Junta Financiera de la Oficina del Comisionado de Instituciones Financieras y que esté en vigor cuando se dicte la sentencia. Véanse: E.L.A. v. Rexco Industries, Inc., 137 D.P.R. 683 (1994); Hernández Colón, op. cit., Sees. 4301-4303.
Por último, la Regla 44.1(a) de Procedimiento Civil de 2009 establece que “[l]as costas le serán concedidas a la parte a cuyo favor se resuelva el pleito o se dicte sentencia en apelación o revisión, excepto en aquellos casos en que se disponga lo contrario por ley o por estas reglas”.(37) 32 L.P.R.A. Ap. V. En su inciso (c), la regla citada añade que
[l]a parte a cuyo favor un tribunal apelativo dicte sentencia presentará en la sala del Tribunal de Primera Instancia que *344 decidió el caso Inicialmente y notificará a la parte contraria, dentro del termino jurisdiccional de diez (10) días contados a partir de la devolución del mandato y conforme a los criterios establecidos en el inciso (b) anterior, una relación o memo-rando de todas las partidas de gastos y desembolsos necesa-rios incurridos para la tramitación del recurso ... en el Tribunal Supremo .... íd.
Después de exponer el derecho aplicable a las controver-sias en el caso que nos ocupa, pasamos a resolver la con-troversia inicialmente esbozada.
III
Luego de examinar los autos elevados, colegimos con el Tribunal a quo que el despido del señor Lugo Reyes fue injustificado. Nuestra decisión relativa a este aspecto des-cansa en la deferencia que le otorgamos a la árbitra en su interpretación del término justa causa según la Ley Núm. 80, supra, y nuestra jurisprudencia interpretativa. De tal forma, resta considerar si la árbitra tenía la facultad reme-diadora para conceder los remedios de reposición en el em-pleo y la paga atrasada. A la par, debemos resolver si pro-cede conceder a la parte peticionaria el cobro de las penalidades, los intereses, los honorarios y las costas reclamadas. Veamos.
A. Facultades remediales de la árbitra
En el caso de autos, COPR arguye que la árbitra, a pe-sar de que el convenio colectivo limitaba el laudo de arbi-traje a que fuese emitido conforme a derecho y sin importar que el pacto sindical guardara silencio sobre las sus facul-tades reparadoras, estaba facultada para conceder al señor Lugo Reyes los remedios de la reposición en su antiguo puesto, al igual que el cobro de los ingresos dejados de percibir durante el término de su destitución. No le asiste la razón.
*345 Los empleados de SPU, entre ellos el señor Lugo Reyes, ejercieron su derecho constitucional según la Sec. 17 de nuestra Carta de Derecho, supra, al organizarse colectiva-mente y negociar con su patrono a través de la COPR. De tal manera, la COPR, como representante exclusiva de los obreros de SPU, se amparó en las facultades que le concede la Ley Núm. 130, supra, y negoció un convenio colectivo con la SPU, el cual especificaba, entre otras cosas, los tér-minos y las condiciones de empleo de los trabajadores cu-biertos por el contrato, el status de la organización obrera y el procedimiento para resolver las disputas que surgieran durante la vigencia del contrato. El acuerdo pactado pro-pendía a la paz industrial e implementaba las garantías y los derechos reconocidos a los obreros puertorriqueños en nuestra Constitución.
Ese convenio colectivo vino a tener fuerza de ley entre las partes contratantes, obligando al patrono, a la unión y a los miembros individuales de la unión a cumplir con sus cláusulas y condiciones. A la vez, el convenio colectivo fun-gió como instrumento para implantar la política pública laboral a favor de la negociación colectiva, y este quedó revestido de un alto interés público y mereció nuestro más alto endoso. En el convenio colectivo entre SPU y COPR, las partes establecieron un procedimiento de quejas y agravios en el cual el arbitraje obrero-patronal sería el ve-hículo para resolver sus disputas, confiriendo así a un ter-cero neutral la facultad de rendir una decisión vinculante entre la unión y el patrono. Concretamente, SPU y COPR pactaron que, ante el despido de un empleado, el primer y único paso dentro del procedimiento sería el arbitraje obrero-patronal. Así, el árbitro vino a sustituir al juez, ejer-ciendo su peritaje y conocimiento especializado para dispo-ner rápidamente de la disputa laboral.
SPU y COPR pactaron que el convenio sería conforme a derecho, y como bien reseñamos en nuestra exposición del Derecho, cuando un laudo está condicionado a emitirse de *346 tal manera, el árbitro debe velar celosamente por que se cumplan las reglas jurídicas vigentes en nuestro ordena-miento legal y debe rendir su decisión según las doctrinas legales prevalecientes. En nuestra jurisdicción, cuando las partes no han pactado mayores protecciones con relación a la tenencia y seguridad del empleado en su trabajo, ya sea mediante la formulación de un convenio colectivo —según la prerrogativa que les concede la Ley Núm. 130, supra— o mediante la articulación de un acuerdo de sumisión que así lo disponga, aplican las protecciones básicas reconocidas por nuestro derecho vigente; entiéndase, el remedio único de la mesada que provee la Ley Núm. 80, supra.
Como el convenio colectivo dispone que el laudo debía ser conforme a derecho, y al ser silente con relación a los remedios que la árbitra podía conceder, esta estaba limi-tada por los postulados de la Ley Núm. 80, supra, y su jurisprudencia interpretativa. Como tal, la árbitra solo es-taba facultada a conceder el remedio exclusivo de la me-sada que provee la Ley Núm. 80, supra, ya que no estaba presente alguna de las tres excepciones antes discutidas relativas a la norma del remedio exclusivo.
Igualmente, al examinar de forma integral el convenio colectivo y el acuerdo de sumisión, no surge expresamente que las partes habían pactado que la árbitra tendría facul-tades remediadoras mayores a las ya provistas por nuestro ordenamiento legal. Reconocer lo contrario atenta contra la política pública imperante en nuestra jurisdicción rela-cionada con la importancia y el poder vinculante de la ne-gociación colectiva laboral. Como bien expusimos anterior-mente, la celebración de convenios colectivos garantiza la paz industrial y la armonía laboral. Conceder amplio mar-gen a un árbitro para que diseñe remedios cuando el laudo está condicionado a emitirse conforme a derecho y las par-tes nada han dispuesto sobre los poderes del árbitro, so-cava principios básicos de derecho contractual y lesiona el acuerdo de voluntades establecido en el convenio colectivo.
*347 Al redactar un convenio sindical, ambas partes —el pa-trono y el representante exclusivo— han llegado a un consenso neutral mediante el cual han renunciado a deter-minadas posturas o designios, entendiendo que para la sana convivencia laboral resulta más beneficioso “el punto medio”. En el caso de autos, ese “punto medio” se encon-traba en condicionar el resultado del proceso de arbitraje a que fuera conforme a derecho, con las implicaciones y con-secuencias ya explicadas. Un laudo conforme a derecho confiere a las partes la certidumbre de que el resultado arbitral estará estrictamente aferrado a los límites de la ley, y que no se concederá un remedio más allá del provisto por nuestro andamiaje jurídico.
Si las partes hubiesen tenido la intención de proveer a todo empleado injustamente destituido los remedios de la reposición en el empleo y la concesión de paga atrasada, así lo hubiesen reconocido expresamente en su convenio la-boral o no hubiesen dispuesto en él que todo laudo arbitral se tenía que emitir conforme a derecho. En cambio, si las partes no hubiesen condicionado el convenio colectivo a que fuese de esa manera, el árbitro gozaría de una facultad amplia para diseñar remedios como los aquí impugnados; claro está, siempre y cuando tales remedios se derivaran de la esencia del convenio colectivo y del acuerdo de sumisión de acuerdo con el cual se actuaba. Es evidente que este no es el caso ante nos.
Además, una vez caducó el convenio vigente al momento del despido del señor Lugo Reyes, las partes acordaron un segundo contrato colectivo, el cual expresamente proveía al árbitro la facultad de conceder la reposición en el empleo y la paga atrasada si este encontraba que el despido era injustificado.(38) Lo anterior confirma que en el convenio aplicable al caso de autos —firmado el 12 de marzo de *348 2002— las partes no tenían la intención de proveer a la árbitra el poder de conceder la reposición del señor Lugo Reyes en el empleo ni el cobro de salarios dejados de per-cibir mientras estuvo destituido. Al conceder los remedios indicados, la árbitra operó fuera de su esfera de autoridad.
Confirmar las actuaciones de la árbitra traería incerti-dumbre e imprecisión al ámbito obrero-patronal. Indubita-damente, la árbitra en este caso abusó de su discreción al distorsionar el significado jurisprudencial de lo que repre-senta un laudo conforme a derecho cuando se aventuró más allá de lo consignado en nuestro ordenamiento legal y al adjudicarse prerrogativas remediadoras que no emanaban de una lectura serena del convenio colectivo y el acuerdo de sumisión. Cabe recordar que el convenio colectivo no solo es la ley entre las partes, sino el marco jurisdiccional del árbitro. Traspasar más allá de sus límites, cuando este consigna que los laudos se deben emitir conforme a dere-cho, solo conduce a la distorsión de la voluntad de los con-tratantes y a la creación de inseguridad jurídica en los sin-dicatos y patronos, quienes ahora quedan a la merced de un árbitro que se puede conferir poderes más allá del ám-bito pactado y de la esencia del contrato. Lejos de consti-tuir un simple error de interpretación —el cual no justifica la intervención judicial— las actuaciones de la árbitra re-presentan un repudio manifiesto del Derecho, el cual no merece nuestra deferencia.
En el caso que nos ocupa, lo jurídicamente correcto es revocar los remedios de reposición en el empleo y paga atrasada que la árbitra concedió indebidamente y limitar la indemnización del señor Lugo Reyes a lo mínimo dis-puesto por la Ley Núm. 80, supra: entiéndase, la mesada.
B. Penalidades, intereses, honorarios y costas
La peticionaria ha exigido el pago de costas, gastos, in-tereses legales y honorarios de abogado por temeridad. Igualmente, exige que el patrono satisfaga los honorarios *349 profesionales de su abogado a razón de un 25% de la cuan-tía total adeudada al señor Lugo Reyes.
Como bien reseñamos en nuestra exposición del Dere-cho, de acuerdo con la Ley Núm. 402, supra, un abogado no puede cobrar a su cliente los honorarios si este es un tra-bajador que insta una reclamación laboral, ya que eso equivale a permitir que se reduzca el valor del trabajo del obrero en la cantidad que pague a su representante legal. Ante tal prohibición, los tribunales están llamados a fijar la cuantía por honorarios profesionales que cobrará el abo-gado del obrero mediante los criterios que se han estable-cido en nuestra jurisprudencia o por mandato de ley. El pago de estos honorarios procederá del peculio del patrono.
En el caso de la referida Ley Núm. 80, supra, hemos dispuesto en Hernández Maldonado v. Taco Maker, supra, que los tribunales concederán por honorarios de abogado una suma no menor del 15% del total de la compensación del trabajador o $100, lo que sea mayor. Fundamentándo-nos en la opinión indicada, resolvemos que en el caso de autos, como mínimo, aplica conceder por honorarios de abogados el 15% del total de la compensación que obtuvo el obrero. Como resultado, devolvemos el caso al Tribunal de Primera Instancia para que fije los honorarios de abogado según lo dispuesto en esta Opinión.
Con relación al pago de honorarios e intereses por teme-ridad, encontramos que estos no proceden porque no existe prueba de que SPU actuó frívola o temerariamente en el cauce judicial. Las actuaciones de SPU no hicieron necesa-rio un pleito que se pudo evitar ni provocaron su indebida prolongación. Al ser un caso resuelto vía opinión por pri-mera vez, SPU estaba justificada en recurrir al foro judicial para litigar su causa de acción.
Por otro lado, debido a que la Regla 44.3(a) de Procedi-miento Civil, supra, ordena que se impongan intereses le-gales mandatoriamente en toda sentencia que requiera el *350 pago de dinero, ordenamos que SPU pague intereses lega-les desde la fecha en que se dictó la sentencia en el Tribunal de Primera Instancia sobre la cuantía de la sentencia (la mesada), incluyendo las costas y los honorarios de abogado. El pago de interés será al tipo que fije por regla-mento la Junta Financiera de la Oficina del Comisionado de Instituciones Financieras y que esté en vigor al mo-mento de dictarse sentencia..
Por último, según dispone la Regla 44.1(a) de Procedi-miento Civil, supra, las costas se concederán a la parte a cuyo favor se resuelva el pleito o se dicte sentencia en apelación. En el caso que nos ocupa, el obrero es la parte victoriosa, ya que lo despidieron sin justa causa y es acree-dor de la mesada, sin importar que eventualmente los re-medios que originalmente le confirieron se hayan reducido en su valor.
Como resultado, según dispone el inciso (c) de la Regla 44.1, supra, ordenamos al abogado del obrero que presente en la sala del Tribunal de Primera Instancia que decidió el caso inicialmente, dentro del término jurisdiccional de diez días a partir de la notificación de esta Sentencia, una rela-ción o memorando de todas la partidas de gastos y desem-bolsos necesarios en que incurrió para tramitar el recurso ante este Tribunal. Esta relación o memorando deberá cumplir con los criterios esbozados en el inciso (b) de la Regla 44.1 de Procedimiento Civil, supra.
IV
Por los fundamentos antes expuestos, resolvemos otor-garle deferencia a la determinación arbitral de que el des-pido del señor Lugo Reyes, en efecto, fue injustificado, pero limitamos el remedio concedido a la mesada que dispone la Ley Núm. 80, supra. Igualmente, el patrono deberá pagar intereses legales desde la fecha en que se dictó la sentencia en el Tribunal de Primera Instancia sobre la cuantía de la *351 sentencia (La mesada), incluso las costas y los honorarios de abogado. Por ultimo, devolvemos el caso al Tribunal de Pri-mera Instancia para precisar el porcentaje correspondiente por honorarios de abogado y las costas según reseñado en esta Opinión.

Se dictará sentencia de conformidad.

La Juez Asociada Señora Rodríguez Rodríguez concu-rrió con la decisión mayoritaria sin opinión escrita. La Jueza Asociada Señora Fiol Matta emitió una opinión disidente.

 El Tribunal de Apelaciones le confirió deferencia a la determinación de la árbitra de que el despido, en efecto, fue injustificado, pero revocó la otorgación de los remedios de reposición del empleado en su antiguo puesto y la concesión de los haberes dejados de percibir mientras estuvo destituido.

 Según imputado por Servidores Públicos Unidos de Puerto Rico (SPU), el señor Lugo Reyes violó el Art. XI, B(l) y (2), violaciones 3, 8 y 19 del Reglamento de Personal para los Empleados.de Servidores Públicos Unidos de Puerto Rico, AFS-CME (SPU) (Reglamento de Personal). Apéndice del Recurso de certiorari, págs. 3-4. Estas disposiciones prohíben que un empleado realice un acto o use lenguaje ame-nazante, indecente u obsceno contra compañeros de trabajo o miembros de SPU; que incurra en conducta impropia dentro o fuera del trabajo de tal naturaleza que afecte el buen nombre, refleje descrédito o ponga en dificultad a SPU/AFSCME, o que realice o fomente prácticas de hostigamiento sexual en el empleo. Ante una violación de estas disposiciones, el Reglamento provee para un método de disciplina progre-siva, donde el empleado estarájsujeto a diferentes tipos de sanciones dependiendo de la frecuencia de la infracción. Id.
De acuerdo con el laudo de arbitraje del Negociado de Conciliación y Arbitraje del Departamento del Trabajo y Recursos Humanos (Negociado), SPU alegó que “el 1 de febrero de 2002, en las oficinas centrales de SPU, el señor Lugo Reyes hizo expre-siones despectivas y discriminatorias en contra de la Sra. Gladys Pérez Santiago, Secretaria Tesorera de la Unión de Personal Administrativo'Secretarial y de Oficina (PASO), afiliada a SPU”. Id., págs. 6 y 8. Asimismo, se le imputa al señor Lugo Reyes haber distribuido el 25 de febrero de 2002, en las oficinas centrales de SPU, un boletín titulado Los pichones le tiran a las escopetas, en el se utilizó lenguaje ofensivo y peyorativo para referirse a varios líderes y presidentes de uniones locales afiliadas a la SPU, incluso al Director Ejecutivo y de Organización de esta. íd., pág. 7. Por último, SPU alegó que al señor Lugo Reyes lo transfirieron de una campaña organi-zativa a otra por no cumplir adecuadamente con sus funciones. íd., pág. 11.

 Luego del despido del señor Lugo Reyes y de quedar el caso sometido para ser resuelto por la árbitra, SPU y la Confederación de Organizadores de Puerto Rico (COPR) acordaron un nuevo convenio colectivo, el cual se firmó el 16 de enero de 2004. Apéndice del Alegato de la parte recurrida, págs. 2-41. En este —a diferencia del convenio colectivo aplicable a los hechos del caso de autos— las partes pactaron expresamente que un empleado que fuese despedido injustificadamente sería acree-dor de los remedios de reposición en el emplep y el cobro de los haberes dejados de percibir durante el término de la destitución. Id. Véase Apéndice II del Alegato de la parte recurrida (Convenio Colectivo firmado el 16 de enero de 2004 entre COPR y SPU, Art. X, H-5, pág. 14).

 Convenio Colectivo firmado el 12 de marzo de 2002 entre y por SPU y ¡a COPR, págs. 10-13, Apéndice del Recurso de certiorari, págs. 133-134.

 íd., págs. 135-136. A diferencia del convenio pactado el 16 de enero de 2004, este convenio nada disponía acerca de la facultad del árbitro para conceder los re-medios de restitución en el empleo y la paga de los haberes dejados de percibir durante el tiempo en el cual estuvo destituido.

 SPU propuso como proyecto de sumisión lo siguiente:
*309 “Determinar por la Honorable Árbitro si el despido del querellante, estuvo o no justificado, a base de la conducta reiterada de éste, en denigrar y afectar la imagen de SPU y sus miembros, así como a base de la prueba presentada. La Honorable Árbitro proveerá el remedio adecuado.” Apéndice del Recurso de certiorari, pág. 2.
Por su parte, la COPR propuso como proyecto de sumisión lo siguiente:
“Que la Honorable Árbitro determine si el despido del Sr. Anselmo Lugo Reyes, tuvo o no justa causa. De resolver que el despido fue injustificado, que la Honorable Árbitro declare con lugar la querella y consecuentemente, ordene a la parte quere-llada que le satisfaga al Sr. Lugo Reyes, los siguientes remedios apropiados: reposi-ción en el empleo, salarios dejados de percibir, estipendio de automóvil, ‘per diems’ de avanzada de la campaña de la Administración de Rehabilitación Vocacional, reem-bolso de los gastos de plan médico que el Patrono le pagaba, cualquier otro beneficio que aparezca en el Convenio Colectivo, y sobre la cuantía total, que se adjudique como remedios económicos, un 25% de honorarios de abogado y pagar al querellante una suma igual a la que se adjudique por salarios y demás haberes dejados de devengar, como penalidad automática por Ley.” íd., págs. 2-3.

 El Reglamento para el Orden Interno de los Servicios de Arbitraje del Nego-ciado de Conciliación y Arbitraje del Departamento del Trabajo y Recursos Humanos dispone que “[e]n la eventualidad de que las partes no logren un acuerdo de sumi-sión, dentro de un término razonable, el árbitro determinará el asunto preciso a ser resuelto tomando en consideración el convenio colectivo, las contenciones de las par-tes y la evidencia admitida”. Art. IX(b), Reglamento Núm. 6065 de 27 de septiembre de 1999, págs. 6-7.

 Apéndice del Recurso de certiorari, pág. 3.

 Al igual que la Ley Núm. 130 de 8 de mayo de 1945 (Ley Núm. 130), según enmendada, 29 L.P.R.A. sec. 61 et seq., la National Labor Relations Act de 1935, según enmendada, conocida como la Ley Wagner, 29 U.S.C.A. see. 151 et seq., “fo-menta la práctica de la negociación colectiva y la amplia y absoluta libertad de organización de los trabajadores, como medios para facilitar el libre flujo de los bienes en el comercio ...”. D. Fernández y C. Romany, Derecho laboral: casos y ma-teriales, Río Piedras, Ed. U.P.R., 1987, T. I, pág. 33. Véase, también, M.C. Harper, S. Estreieher y J. Flynn, Labor Law: Cases, Materials, and Problems, 6ta ed., Nueva York, Aspen Publishers, 2007, págs. 86-88 (“Prominent among the purposes ... of the [National Labor Relations Act] (NLRA) ... is the prevention of industrial strife. ... By providing an administrative procedure for resolving recognitional disputes, the Act helped reduce industrial conflict. ... The NLRA assumes that inequality of bargaining power can be corrected by protecting workers’ ability to obtain collective representation”).
Posteriormente, la Ley Wagner fue enmendada por la Labor Management Relations Act de 1947, conocida como la Ley Taft-Hartley (29 U.S.C.A. sec. 141-197). Fernández y Romany, op. cit, pág. 33. Véase, también, E.M. Toledo, Leyes de Rela-ciones del Trabajo, Hato Rey, Eds. Situm, ed. rev. 2000, págs. 3-4. Esta disposición legal trajo consigo variadas limitaciones al movimiento sindical que había florecido bajo la Ley Wagner, ya que las uniones habían perdido la confianza de la población norteamericana. íd. Véase, también, Harper, op. cit., pág. 89 (“The Taft-Harley amendments to the NLRA ... were in part a response to the strike wave of late 1945 and 1946 and the widespread public perception of abuse of union power. ... The 1947 amendments marked a clear shift in tone from the original Wagner Act, from a measure reflecting affirmative support of unionization and collective bargaining to one that appeared to take a more neutral ... interests of all workers”).
Entre otros cambios a la Ley Wagner, la Ley Taft-Harley declaró ilícitas ciertas prácticas de las uniones; permitió que los patronos llevaran quejas a la Junta Na- *312 cional de Relaciones del Trabajo y estableció reglas para la operación, el manejo y las actividades de las uniones. Toledo, op. cit., págs. 4-5. Véase, también, González v. Mayagüez Resort & Casino, 176 D.P.R. 848 (2009).

 La negociación colectiva se define como “[e]l proceso de discusión, trato y ajuste entre un patrono o varios patronos y una unión o sindicato o varias uniones, para concertar un convenio colectivo en el cual se incluyen salarios, condiciones de trabajo, seguridad de la unión y otros beneficios, así como el arreglo por arbitraje de los problemas originados durante la vigencia del convenio”. M.M. Ballester, Vocabu-lario obrero-patronal: de acuerdo con la legislación vigente en Puerto Rico, San Juan, Estado Libre Asociado de Puerto Rico, Departamento del Trabajo, 1962, pág. 59.

 Específicamente, el Art. 1 establece que
“[l]a política pública del Gobierno de Puerto Rico, en lo que respecta a las rela-ciones entre patronos y empleados y a la celebración de convenios colectivos, es la que a continuación se expresa:
“(1) Es necesidad fundamental del pueblo de Puerto Rico alcanzar el máximo desarrollo de su producción a fin de establecer los niveles más altos de vida posibles para su población en continuo crecimiento; es la obligación del Gobierno de Puerto Rico adoptar aquellas medidas que conduzcan al desarrollo máximo de esa produc-ción y que eliminen la amenaza de que pueda sobrevenir el día en que por el creci-miento continuo de la población y la imposibilidad de mantener un aumento equiva-lente en la producción tenga el pueblo que confrontar una catástrofe irremediable; y es el propósito del Gobierno desarrollar y mantener tal producción mediante la com-prensión y educación de todos los elementos que integran el pueblo respecto a la necesidad fundamental de elevar la producción hasta su máximo, de distribuir esa producción tan equitativamente como sea posible; y es asimismo el propósito del Gobierno desarrollar en la práctica el principio de la negociación colectiva, en tal forma que pueda resolverse el problema básico de la necesidad de una producción máxima.
“(2) Paz industrial, salarios adecuados y seguros para los empleados, así como la producción ininterrumpida de artículos y servicios, a través de la negociación colec-tiva, son factores esenciales para el desarrollo económico de Puerto Rico. El logro de estos propósitos depende en grado sumo de que las relaciones entre patronos y em-pleados sean justas, amistosas y mutuamente satisfactorias y que se disponga de los medios adecuados para resolver pacíficamente las controversias obrero-patronales.
“(3) A través de la negociación colectiva deberán fijarse los términos y condicio-nes de empleo. A los fines de tal negociación, patronos y empleados tendrán el dere- *313 cho de asociarse en organizaciones por ellos mismos escogidas.
“(4) Es la política del Gobierno eliminar las causas de ciertas disputas obreras, fomentando las prácticas y procedimientos de la negociación colectiva y estable-ciendo un tribunal adecuado, eficaz, e imparcial que implante esa política.
“(5) Todos los convenios colectivos vigentes, y los que se hagan en el futuro, por la presente se declaran instrumentos para promover la política pública del Gobierno de Puerto Rico en su esfuerzo de fomentar la producción hasta el máximo; y se declara que como tales están revestidos de un interés público. El ejercicio de los derechos y el cumplimiento de las obligaciones de las partes en dichos convenios colectivos que-dan, por tanto, sujetos a aquella razonable reglamentación que sea necesaria para lograr las normas públicas de este subcapítulo.” (Énfasis suplido.) 29 L.P.R.A. see. 62.

 El Art. 4 de la Ley Núm. 130, supra, 29 L.P.R.A. see. 65, es idéntico en su naturaleza a la See. 7 originalmente legislada en la Ley Wagner. Fernández y Romany, op. cit., pág. 33. Véase, también, Toledo, op. cit., págs. 3-4. La See. 7 de la Ley Wagner disponía originalmente lo siguiente:
“ ‘Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through, representatives of their own choosing, and to engage in concerted activities for the purpose of collective bargaining or other mutual aid or protection.’ ” Fernández y Romany, op. cit., pág. 33.
El propósito central de la Sec. 7 de la Ley Wagner consistía en otorgar a los trabajadores estadounidenses tres derechos fundamentales, a saber: (1) el derecho a la organización; (2) el derecho a la negociación colectiva, y (3) el derecho a la cele-bración de huelgas y piquetes pacíficos. íd. Estos derechos los implementaban otras disposiciones de la Ley Wagner las cuales declaraban ilícitas ciertas prácticas del patrono y prohibían la coacción o intervención de este con los empleados en el ejer-cicio de los derechos consignados en la See. 7. Id.

 Como corolario del derecho fundamental a la organización y negociación colectiva, las Secs. 12, 15, 16 y 18 de nuestra Carta de Derechos añaden garantías indispensables para el movimiento obrero puertorriqueño. Así, la Sec. 12 prohíbe la esclavitud y cualquier forma de servidumbre involuntaria. Art. II, Sec. 12, Const. E.L.A., L.P.R.A., Tomo 1, ed. 2008, pág. 364. La Sec. 15 no permite “el empleo de menores de catorce años en cualquier ocupación perjudicial a la salud o a la moral o que de alguna manera amenace la vida o integridad física”. Art. II, Sec. 15, Const. E.L.A., supra, pág. 368. Por su parte, la Sec. 16 dispone que
“fsje reconoce el derecho de todo trabajador a escoger libremente su ocupación y a renunciar a ella, a recibir igual paga por igual trabajo, a un salario mínimo razo-nable, a protección contra riesgos para su salud o integridad personal en su trabajo o empleo, y a una jornada ordinaria que no exceda de ocho horas de trabajo. Sólo podrá trabajarse en exceso de este límite diario, mediante compensación extraordi-naria que nunca será menor de una vez y media el tipo de salario ordinario, según se disponga por ley.” Art. II, Sec. 16, Const. E.L.A., supra, pág. 369.
Igualmente, la Sec. 18 expresa que,
“[a[ fin de asegurar el derecho a organizarse y a negociar colectivamente, los trabajadores de empresas, negocios y patronos privados y de agencias o instrumen-talidades del gobierno que funcionen como empresas o negocios privados tendrán, en sus relaciones directas con sus propios patronos, el derecho a la huelga, a establecer piquetes y a llevar a cabo otras actividades concertadas legales.” Art. II, Sec. 18, Const. E.L.A., supra, pág. 377.
*317 Esta red de derechos constitucionales “sirv[e] para proteger a distintos grupos de empleados de una conducta patronal históricamente opresiva, prohibir dicha con-ducta y garantizar ciertos derechos al fortalecer los esfuerzos sindicales de los trabajadores”. D.M. Helfeld, La política laboral constitucional del 1952: sus princi-pios esenciales y los factores que la influenciaron, 72 (Núm. 2) Rev. Jur. U.P.R., 143, 145 (2003).
Amerita indicar que, según expuso el distinguido José Trías Monge, los dere-chos esbozados en la Sec. 17 del Art. II de nuestra Constitución germinan del Art. 23(4) de la Declaración Universal de los Derechos del Hombre de las Naciones Unidas. J. Trías Monge, Historia Constitucional de Puerto Rico, Río Piedras, Ed.' U.P.R., 1982, Vol. III, pág. 201.

 Como ya hemos expresado,
“[e]uando existe un convenio colectivo y dicho convenio contiene cláusulas para el procesamiento de quejas y agravios y para su decisión o arbitraje, éstas deben ser observadas por todos los que intervienen en el campo de las relaciones obrero-patronales: los obreros, los patronos, las uniones, la Junta de Relaciones del Trabajo y los tribunales.” San Juan Mercantile Corp. v. J.R.T., 104 D.P.R. 86, 90 (1975).

 Según dispone acertadamente el Prof. David Helfeld,
“[u]n estudio del derecho de arbitraje en Puerto Rico forzosamente tiene que incorporar tanto el derecho federal como el de Puerto Rico. ... Es así, porque las normas federales del derecho estatutario y jurisprudencial en el campo arbitral ... aplican plenamente en Puerto Rico, con igual fuerza como si fuese un Estado de la Unión. ... [E]l derecho puertorriqueño en este campo ha sido profundamente influido por unos modelos federales y hay que analizar esa influencia para entender el desa-rrollo jurídico que ha transcurrido. A fin de cuentas, lo que ha resultado en Puerto Rico es un sistema de derecho arbitral con elementos federales y puertorriqueños que interactúan dinámicamente.” D. Helfeld, La jurisprudencia creadora: factor de-terminante en el desarrollo del derecho de arbitraje en Puerto Rico, 70 (Núm. 1) Rev. Jur. U.P.R. 1, 2 (2001).

 El tratadista de arbitraje obrero-patronal, Frank Elkouri, establece: “Arbitration ... is a ‘simple proceeding voluntarily chosen by parties who want a dispute determined by an impartial judge of their own mutual selection, whose decision, based on the merits of the case, they agree in advance to accept as final and binding’.” F. Elkouri y E. Elkouri, How Arbitration Works, (A.M.Ruben, ed.), 6ta ed., Washington, D.C., BNA Books, 2003, pág. 3.
A diferencia de la mediación, conciliación o transacción —en donde las partes tienen la opción de acoger o rechazar las recomendaciones del tercero mediador o conciliador— en el arbitraje las partes están compelidas por su propio acuerdo de aceptar la decisión del árbitro como final y vinculante. Id., pág. 7. Contrario a estas figuras afines, el objetivo del arbitraje es la adjudicación y no el compromiso. Id.

 Con relación a la multiplicidad de procesos amparados según el término arbitraje, el Prof. David Helfeld explica que
“[l]o que comenzó como un método relativamente sencillo se ha transformado en nuestra época en una gran variedad de procesos, utilizando todos el nombre común de arbitraje. La gama es extensa: el arbitraje entre naciones, el arbitraje comercial internacional y, el arbitraje comercial doméstico, entre otros. Este último está com-puesto de diversas ramas tales como la construcción, la banca, la propiedad intelec-tual, el comercio entre los negocios y el comercio entre las industrias de seguros de valores y de bienes raíces y sus clientes, el arbitraje en el campo de impericia profe-sional, en el derecho de familia, en disputas relacionadas con el ambiente y por supuesto, en disputas laborales en los sectores privados y públicos, incluyendo con-troversias en el empleo en casos donde no hay presencia sindical. Se ha extendido el arbitraje de derechos para cubrir también el arbitraje de intereses en el área laboral, y el arbitraje compulsorio a cambio de la prohibición de la huelga, y para mencionar *323 la novedad más reciente, el arbitraje adscrito a los tribunales como parte de un programa de métodos alternos de resolución de disputas.” (Escolios omitidos.) Hel-feld, La jurisprudencia creadora, supra, págs. 5-6. Véase, también, Vivoni Forage v. Ortiz Carro, 179 D.P.R. 990 (2010).

 En resumen, sus características esenciales consisten en: (1) ser un juicio de tipo contencioso y adjudicativo; (2) ser un proceso de naturaleza privada, con excep-ción del arbitraje realizado por el Negociado; (3) gozar de informalidad y flexibilidad en comparación con el proceso judicial; (4) no requerir el uso de la doctrina del precedente ni los principios de derecho sustantivo, claro está, siempre y cuando el laudo no se limite a ser emitido conforme a derecho-, (5) contar con árbitros que poseen un alto grado de peritaje y conocimiento especializado, los cuales emiten laudos merecedores de la deferencia de los tribunales, y (6) representar un proceso menos costoso que el proceso ordinario ante los foros judiciales. D. Fernández Quiñones, El Arbitraje Obrero-patronal, Colombia, Ed. Forum, 2000, págs. 25-27.

 “Utilizamos el concepto ‘arbitraje compulsorio legislativo’ para diferenciar la situación en que el mecanismo de arbitraje es de naturaleza obligatoria por así acor-darlo las partes [ — arbitraje voluntario — ], de cuando su carácter imperativo es por *325 razón de una ley especial.” Colón Molinary v. A.A.A., 103 D.P.R. 143, 146 esc. 1 (1974).

 “Collective-bargaining agreements commonly provide grievance procedures to settle disputes between union and employer with respect to the interpretation and application of the agreement and require binding arbitration for unsettled grievances.”Paperworkers v. Misco, Inc., 484 U.S. 29, 36 (1987).

 Otros lo plantean de la manera siguiente:
“Labor arbitration’s methods have become quite standardized .... [TJhe overwhelming majority of today’s collective bargaining relationships provide for ad hoc arbitrators or (an increasing trend) for a designated panel of arbitrators used in turn. In both cases, the union ‘owns’ the grievance, selects the arbitrator jointly with the employer [and] represents the grievant at the hearing.” D. Nolan, Issues in Labor Arbitration, en American Arbitration Association, Handbook on Labor Arbitration, (T.E. Carbonneau y J.P. McConnaughay, eds.), Nueva York, JurisNet, 2007, pág. 7.

 Como veremos, existen contadas excepciones que permiten la revisión judicial del laudo arbitral.

 gj poro Supremo federal ha reconocido los beneficios que brinda la figura del árbitro por el conocimiento especializado que posee. Así, en Steelworkers v. Enterprise Corp., 363 U.S. 593, 596 (1960), el Tribunal dispuso:
“... the arbitrators under these collective agreements are indispensable agencies in a continuous collective bargaining process. They sit to settle disputes at the plant level —disputes that require for their solution knowledge of the custom and practices of a particular factory or of a particular industry as reflected in particular agreements." (Énfasis suplido.)

 Además, expresamos que
“[e]l árbitro no está limitado exclusivamente al contenido del convenio, sino que puede hacer uso de otras fuentes siempre que no se aparte de la esencia del convenio. La libertad de interpretación del árbitro dependerá de la claridad de las cláusulas del convenio. Una cláusula, cuyo lenguaje parece ser claro, puede ser ambigua si admite que se le dé interpretaciones conflictivas. Dentro de estas limitaciones, el árbitro tiene flexibilidad para emitir su interpretación
“Al interpretar un convenio colectivo, el árbitro debe adscribirle al lenguaje utilizado el significado común ..., salvo cuando expresamente se disponga un signi-ficado o definición especial; a los términos técnicos les debe dar su significado usual. Debe leer el convenio como un todo y cada parte debe interpretarla en referencia a las demás cláusulas, de forma que le dé efectividad al propósito general del mismo. Los usos y[las] prácticas pasadas deben ofrecerle guías significativas para la interpreta-ción de las cláusulas. El árbitro debe perseguir que la interpretación que haga de las disposiciones del convenio arrojen un significado razonable y efectivo d[e é]ste. (Én-fasis suplido y cita omitida.) J.R.T. v. Junta Adm. Muelle Mun. de Ponce, 122 D.P.R. 318, 331 (1988).

 Tratadistas en derecho laboral han dispuesto:
"... an arbitral decision, unlike those of courts, is, in theory, subject only to the most limited form of review. The decision of the arbitrator, acting within the power granted him by the agreement, is final, and not reviewable on the merits by any court, unless the party attacking the decision can demonstrate fraud, partiality, or misconduct on the part of the arbitrator. So great is the presumption in favor of the finality and validity of the award that the Court has held that the finality provision has sufficient force to surmount even instances of mistake.” (Escolios omitidos.) M. Hill, Jr. y A.V. Sinicropi, Remedies in Arbitration, Washington, D.C., BNA Books, 1981, pág. 20.

9) Steelworkers v. American Mfg. Co., 363 U.S. 564 (1960); Steelworkers v. Warrior & Gulf Co., 363 U.S. 574 (1960); Steelworkers v. Enterprise Corp., supra.

 El Juez Asociado, Hon. Francisco Rebollo López, suscribió una opinión de conformidad, a la cual se unió la distinguida compañera Jueza Asociada, Hon. Liana Fiol Matta. La opinión suscrita por dichos Jueces reconocía facultades remediadoras amplias a los árbitros, sin importar que el laudo se tuviera que emitir conforme a derecho, o que este fuese silente con relación a los poderes remediadores que recono-cía al árbitro.

 “[Tjhe parties may ... control the arbitrator’s remedy power by ... placing specific limitations on his discretion when interpreting the contract.” Hill, Jr. y Si-nicropi, op. cit., pág. 28. De tal manera, al disponer que el laudo debía ser conforme a derecho, las partes limitan la discreción del árbitro para formular remedios, per-mitiendo únicamente el remedio de la mesada.

 El Art. 2 de la Ley Núm. 80 de 30 de mayo de 1976 (29 L.P.R.A. sec. 185b), dispone que
“[s]e entenderá por justa causa para el despido de un empleado de un estable-cimiento:
“(a) Que el obrero siga un patrón de conducta impropia o desordenada.
“(b) La actitud del empleado de no rendir su trabajo en forma eficiente o de hacerlo tardía y negligentemente o en violación de las normas de calidad del pro-ducto que se produce o maneja por el establecimiento.
“(c) Violación reiterada por el empleado de las reglas y reglamentos razonables establecidas para el funcionamiento del establecimiento siempre que copia escrita de los mismos se haya suministrado oportunamente al empleado.
“(d) Cierre total, temporero o parcial de las operaciones del establecimiento.
“Disponiéndose, que en aquellos casos en que la empresa posea más de una oficina, fábrica, sucursal o planta, el cierre total, temporero o parcial de las opera-ciones de cualquiera de éstos establecimientos, constituirá justa causa para el des-pido a tenor con esta sección.
“(e) Los cambios tecnológicos o de reorganización, así como los de estilo, diseño o naturaleza del producto que se produce o maneja por el establecimiento y los cam-bios en servicios rendidos al público.
“(f) Reducciones en empleo que se hacen necesarias debido a una reducción en el volumen de producción, ventas o ganancias, anticipadas o que prevalecen al ocurrir el despido.
“No se considerará despido por justa causa aquel que se hace por mero capricho del patrono o sin razón relacionada con el buen y normal funcionamiento del establecimiento. Tampoco se considerará justa causa para el despido de un empleado la colaboración o expresiones hechas por éste, relacionadas con el negocio de su patrono, en una investigación ante cualquier foro administrativo, judicial o legisla-tivo en Puerto Rico, cuando dichas expresiones no sean de carácter difamatorio ni constituyan divulgación de información privilegiada según la ley. En este último caso, el empleado así despedido tendrá derecho, además de cualquier otra adjudica-ción que correspondiere, a que se ordene su inmediata restitución en el empleo y a que se le compense por una suma igual a los salarios y beneficios dejados de percibir desde la fecha del despido hasta que un tribunal ordene la reposición en el empleo.”

 El Art. 1 de la Ley Núm. 80, supra, 29 L.P.R.A. sec. 185a, fue enmendado por la Ley Núm. 128 de 7 de octubre de 2005. Hoy, en lo pertinente, este artículo esta-blece que la mesada consiste en:
“(a) El sueldo correspondiente a dos [ (2) ] meses por concepto de indemnización, si el despido ocurre dentro de los primeros cinco (5) años de servicio; el sueldo co-rrespondiente a tres (3) meses si el despido ocurre luego de los cinco (5) años hasta los quince (15) años de servicio; el sueldo correspondiente a seis (6) meses si el despido ocurre luego de los quince (15) años de servicio;
“(b) Una indemnización progresiva adicional equivalente a una (1) semana por cada año de servicio, si el despido ocurre dentro de los primeros cinco (5) años de servicio; dos (2) semanas por cada año de servicio, si el despido ocurre luego de los cinco (5) años hasta los quince (15) años de servicio; tres (3) semanas por cada año de servicio, luego de haber completado quince (15) años o más de servicio.
“Los años de servicio se determinarán sobre la base de todos los periodos de trabajo anteriores acumulados que el empleado haya trabajado para el patrono antes de su cesantía, pero excluyendo aquéllos que por razón de despido o separación anterior le hayan sido compensados o hayan sido objeto de una adjudicación judicial.” 29 L.P.R.A. sec. 185a.
Para criterios adicionales relacionados al modo correcto de computar la mesada, según lo requiere la ley, véanse Arts. 4, 7, 9 y 10 de la Ley Núm. 80, supra, 29 L.P.R.A. secs. 185d, 185g, 185i y 185j.

 Alegato de la parte peticionaria, pág. 15.

 Id., págs. 11-12. Sin embargo, debido a que nuestro dictamen elimina el pago de la partida por salarios dejados de percibir, por ser contrario a las facultades remediadoras que concede el convenio colectivo a la árbitra, no consideraremos el reclamo de COPR de que se penalice al patrono con el pago de una suma igual a los haberes dejados de devengar por el obrero. Por consiguiente, limitaremos nuestra exposición legal a la procedencia de las restantes partidas reclamadas.

 Al imponer el pago de estos honorarios, el tribunal debe considerar los si-guientes cuatro (4) factores, a saber: (1) que un empleado haga una reclamación a su empleador; (2) que la reclamación surja al amparo de la legislación laboral; (3) que el empleador sea un patrono según lo define la Ley Núm. 402, y (4) que se conceda la reclamación. Ortiz y otros v. Mun. de Lajas, 153 D.P.R. 744, 751 (2001).

 No obstante, “[s]i bien la política pública tras [la Ley Núm. 402] es fomentar que trabajadores agraviados vindiquen sus derechos, no podemos perder de perspec-tiva que se trata de casos complejos y costosos, por lo que corresponde compensar justamente a los abogados de los trabajadores”. López Vicil v. ITT Intermedia, lnc., 143 D.P.R. 574, 577 (1997). Por ello,
"... en aquellas situaciones cuando el abogado estime que el esfuerzo realizado, el impacto o resultado excepcional del caso, o el haber enfrentado una defensa hostil justifican el recibir una cuantía mayor en concepto de honorarios, éste podrá solicitar al tribunal su visto bueno para cobrar una tarifa a base de las horas trabajadas. En dicho caso, el abogado estará obligado a presentar un memorando juramentado en el que detalle las horas trabajadas y la tarifa que habrá de cobrar por hora.” Id., pág. 583.

 Ambas reglas conservan el mismo número que poseían según las anteriores Reglas de Procedimiento Civil de 1979. Al comparar los cambios implementados en las nuevas reglas de 2009, reconocemos que estos no afectan la sustancia de lo dis-puesto en las anteriores reglas de 1979. Cf. Reglas 44.1(d) y 44.3 de Procedimiento Civil, 32 L.P.R.A. Ap. III.

 Esta regla conserva el mismo número que poseía según las anteriores Re-glas de Procedimiento Civil de 1979. Al comparar los cambios implementados en las nuevas reglas de 2009, reconocemos que estos no afectan la sustancia de lo dispuesto en la anterior regla de 1979. Cf. Regla 44.3(a) de Procedimiento Civil de 1979 (32 L.P.R.A. Ap. III).

 Esta regla también conserva el mismo número que poseía según las ante-riores Reglas de Procedimiento Civil de 1979. Al comparar los cambios implementa-dos en las nuevas reglas de 2009, reconocemos que éstos no son pertinentes a la controversia ante nos. Cf. Regla 44.3(a) de Procedimiento Civil, 32 L.P.R.A. Ap. III.

 Véase Apéndice II del Alegato de la parte recurrida, Art. X, (H-5), Convenio Colectivo firmado el 16 de enero de 2004 entre COPR y SPU, pág. 14.